Geraldine BROWN et alia, Plaintiffs,

v.

Rudolph W. GIULIANI, etc., et alia, Defendants.

No. CV–94–2842 (CPS).

United States District Court, E.D. New York.

Oct. 27, 1994.

Brooklyn Legal Services by John C. Gray, Jr., Mark Cohan, Brooklyn, NY for plaintiffs.

Paul A. Crotty, Corp. Counsel of the City of New York by Mari Bebon, Asst. Corp. Counsel, New York City, for City defendants.

G. Oliver Koppell, Atty. Gen. of the State of N.Y. by Robert Bacigalupi, Asst. Atty. Gen., New York City, for State defendants.

## MEMORANDUM DECISION
## AND ORDER

SIFTON, District Judge.

This is an action brought pursuant to 42 U.S.C. § 1983 alleging that New York City fails to process public assistance grants pursuant to the federal Aid for Families with Dependent Children ("AFDC") program, 42 U.S.C. §§ 607 *et seq.*, in a timely fashion, in violation of 42 U.S.C. § 602(a)(10)(A); 45 C.F.R. §§ 206.10(a)(1), 233.120; N.Y.Soc. Serv.L. §§ 17, 20, 20–a, 34, 112; 18 N.Y.C.R.R. §§ 351.8, 372, 386.1; Amendment XIV to the United States Constitution; and the New York State Constitution, Art. I, § 6, Art. 17, § 1. Jurisdiction exists over the case under 28 U.S.C. § 1331.

The matter is currently before the Court on plaintiffs' motion for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure seeking an order pending trial requiring the City Defendants to take steps to speed up the processing of claims and restraining these defendants from implementing a cost-cutting measure to redeploy 135 supervisory employees in the New York City Department of Social Services from their current tasks in the processing of claims for AFDC benefits to other areas of the Department's activities.

Plaintiffs also seek a determination that this case may proceed as a class action pursuant to Rule 23 of the Federal Rules of Civil Procedure.

■ In support of and in opposition to the motions, the parties have submitted affidavits, agency records produced in discovery, interrogatory responses, and depositions. Because the underlying facts are essentially undisputed and resolution of those disputes which do exist will not affect plaintiffs' entitlement to the relief awarded, no hearing has been held. Nor is one required. *Drywall Tapers & Pointers Local 1974 v. Local 530,* 954 F.2d 69 (2d Cir.1992); *Fengler v. Numismatic Americana, Inc. v. United States,* 832 F.2d 745, 747 (2d Cir.1987); *SCM v. Xerox,* 507 F.2d 358 (2d Cir.1974); *CFTC v. American Bd. of Trade, Inc.,* 473 F.Supp. 1177, 1178 n. 3 (S.D.N.Y.1979).

For the reasons that follow, plaintiffs' motions for preliminary injunction and for class certification are granted. What follows sets forth the findings of fact and conclusions of law on which the determination to grant these motions is based as required by Rules 65 and 23 of the Federal Rules of Civil Procedure.

## THE PARTIES

Plaintiffs are seven individual recipients of assistance pursuant to the AFDC program. They sue on their own behalf and on behalf of a class of New York City residents who have applied for, been found eligible and received assistance under the AFDC program; who have sought an increase in their grant based on a change of need, an increase in eligible family members, or an emergency; and who have not received action on their requests in a timely fashion.

Defendants are the Mayor of the City of New York, Rudolph W. Giuliani; the Commissioner of the City's Department of Social Services (the "City Agency"); Marva L. Hammons (collectively with the Mayor, the "City Defendants"); and Michael J. Dowling, the Commissioner of the New York State Department of Social Services (the "State Defendant"), all sued in their official capacities. No preliminary injunctive relief has been sought at this stage of the proceedings against the State Defendant.

## THE REGULATORY SCHEME

AFDC is a federal and state cash assistance program designed to provide ongoing aid to poor families with at least one minor child who has been deprived of parental support or care by reason of death, continued absence from the home, unemployment, or physical or mental incapacity of a parent. *See* 42 U.S.C. §§ 601 *et seq.* The program is administered by state governments such as New York according to state plans meeting federal statutory and regulatory criteria, 42 U.S.C. § 602, and by local governments such

as New York City in accordance with state and local regulations. *Id.*

AFDC also includes the Emergency Assistance to Families ("EAF") program, a program which is mandatory for any state participating in AFDC. EAF aids families without available resources where immediate assistance is necessary to avoid emergency or unusual crisis situations threatening an infant member of the family with destitution. *See* C.F.R. § 233.120. In addition, 45 C.F.R. § 233.20(a)(2)(v) authorizes but does not require states to provide federal and state assistance to pay special need items defined by a state AFDC program to all applicants and recipients requiring them. New York State has elected to provide such assistance for special needs including: (1) the additional cost of meals for persons who are unable to prepare meals at home; (2) necessary and essential furniture required for the establishment of a home or to replace furnishing and clothing lost due to a fire, flood or like catastrophe; (3) the repair of heating equipment or household appliances; (4) replacement of lost or stolen checks; (5) money to pay rent, property tax, or mortgage arrears to forestall eviction; and (6) additional needs arising because of pregnancy. *See* N.Y.C.C.R. § 352.7.[1]

Both federal and state law establish time constraints on the processing of requests for benefits under AFDC. Federal law provides in this regard that:

aid to families with dependent children shall, subject to paragraphs (25) [relating to income and eligibility verification] and

(26) [relating to an applicant's or recipient's cooperation *e.g.,* in establishing paternity and entitlement to third-party payments], be furnished [to recipients] with reasonable promptness.

42 U.S.C. § 602(a)(10)(A). Under federal regulations,

[f]inancial assistance ... included in the plan shall be furnished promptly to eligible individuals without any delay attributable to the agency's administrative process....

45 C.F.R. § 206.10(a)(5)(i).

Where an individual has been determined to be eligible, eligibility shall be reconsidered or redetermined[2] ... (ii) promptly after a report is obtained which indicates changes in the individual's circumstances that may affect the amount of assistance to which he is entitled.[3]

45 C.F.R. § 206.10(a)(9)(ii).

New York State's regulations make more definite the federal requirement for prompt disposition of requests for a change in benefits arising because of changed circumstances:

(e) When a social services district receives an indication of ... change in degree of need, action shall be taken to review these situations **as they occur. An investigation shall be initiated promptly and completed within 30 days.**

(f) When a social services district verifies ... an increase in need, action shall be taken **immediately** to increase the grant

---

1. EAF grants are also available for the items of need provided for in 18 N.Y.C.R.R. §§ 352 and 372.4 where an emergency exists.

2. "Redetermination" is defined by the federal regulations as "the review of factors affecting [AFDC] eligibility or payment amount." 45 C.F.R. § 206.10(b)(4).

3. Both sides spend a great deal of effort arguing whether a federal mandate that decisions on applications for assistance be decided within forty-five days, 45 C.F.R. § 206.10(a)(3), applies to requests for increases in benefits due to changes in circumstances on the part of persons who have already been found eligible and are receiving AFDC assistance. Defendants are probably right that the drafters of the federal regulations intended the forty-five day time frame to apply to initial applications for AFDC benefits and not to emergency and other requests to add persons to the family unit or for special needs assistance. But defendants' interpretation of the regulations hardly helps them. If "prompt" action on an initial application for AFDC benefits prior to any determination of eligibility cannot exceed forty-five days, prompt action on a request to increase or change benefits because of a change in circumstances must as a general rule be something less. In all events, as discussed below, defendants have not complied with any reasonable interpretation of promptness with respect to the named plaintiffs' requests for an increase in benefits, and it appears likely that plaintiffs will establish at trial a general failure to comply with the federal mandate of prompt action.

for the next payment period possible under the existing payment procedure.[4]

18 N.Y.C.R.R. § 351.22 (emphasis added).

New York State regulations further provide that an emergency assistance applicant must be given an immediate interview and that eligibility must be determined "immediately." *See* 18 N.Y.C.R.R. § 372.2; New York State Department of Social Services Administrative Directives 87 ADM–18, 86 ADM–7, and 75 ADM–78.

In New York City, public assistance programs such as AFDC are administered by the City Department of Social Services under the supervision of its Commissioner, defendant Hammons. The City Agency has 39 local sites throughout New York City known as Income Support Centers ("ISC's"), at which individuals can apply for public assistance and where active cases are managed. An individual or family seeking to apply for public assistance must go in person to an ISC. Once an initial application for assistance has been investigated, eligibility established, needs verified, and benefits granted by the application section of the agency, the applicant becomes a recipient of assistance, and his or her case is transferred to an "undercare" section of the ISC, where the recipient is assigned an individual caseworker known as an eligibility specialist.

Recipients in need of assistance for an additional family member or for a special need must make a request for those benefits with their undercare eligibility specialist. Plaintiffs state and defendants do not dispute that as a matter of practice the City Agency gives recipients the name and telephone number of their eligibility specialist and encourages recipients to mail or telephone their eligibility specialist to request assistance.

When the recipient requests an additional allowance, the eligibility specialist is supposed to complete a request form recording all details stated by the recipient, including whether the recipient has submitted documentation supporting the request. Copies of the request forms are to be maintained in the case record. In practice, it appears that request forms are not prepared until all doc-

umentation verifying the request is submitted. The eligibility specialist then prepares the necessary authorization for input into the City Agency's computer and forwards the request form and verification to his or her supervisor for review. Once the action granting a request is approved by a supervisor, the authorization is sent for data entry to a special unit in the ISC known as the "Control Unit."

If the recipient expresses a need for immediate assistance, the eligibility specialist is obligated to process the request as one for emergency assistance within the time constraints provided for EAF grants.

Although not directly at issue on this motion for a preliminary injunction, federal regulations impose on a state the obligation to supervise any city agency administering AFDC programs and to take action to ensure that such agency complies with applicable federal mandates. *See* 45 C.F.R. §§ 206.10(a)(12); 7 C.F.R. § 271.4. Among the enforcement mechanisms available to New York State, its Department of Social Services may prescribe the number of local agency employees when the local agency is not complying with federal standards. N.Y.Social Services Law § 20–a. It may also withhold reimbursement of federal or state funds and may seek the removal of a recalcitrant local commissioner. *See* N.Y.Social Services Law §§ 20, 34.

The Office of the Mayor of the City of New York is responsible for the effectiveness of the city's operations and is required to establish and maintain such policies and procedures as are necessary and appropriate to ensure the effectiveness of government operations "including the implementation of effective systems of internal control by each agency" under its jurisdiction. *See* N.Y.City Charter, Chapter 1, § 8(a).

Plaintiffs Geraldine Brown, Xiomara Boza, Reba Bedford, Olga Corredor, Jacqueline Quinones, Michelle Martindale, and Ingrid Armstrong are all New York City residents and eligible AFDC recipients who claim to be suffering irreparable harm due to an alleged city practice of significantly delaying deci-

---

**4.** In New York City, payment periods are bi-weekly.

sions on their requests for AFDC and EAF benefits due to changes of circumstances, including special needs and emergencies, far beyond the periods mandated by federal and state law.

The following are the facts regarding each of the named plaintiffs:

*Geraldine Brown.* Geraldine Brown is a 41–year–old recipient of AFDC benefits who resides in Brooklyn with her two daughters. Her case is handled through the Fulton ISC.

On May 16, 1994, Ms. Brown called her ISC and requested an emergency assistance grant to pay $157.17 to Con Edison to avoid a shutoff of electricity. No record was made by her ISC of her request. On May 24, she appeared in person at the ISC and met with her assigned caseworker, a Ms. Clark. She requested an additional emergency grant of $486 to comply with a stipulation of settlement of a proceeding to evict her from her residence because of her ISC's failure to pay her rent for December 1993, January and February 1994. At the same time, she renewed her request for emergency assistance to pay her electric bill to avoid a shutoff scheduled by Con Edison for May 31. No record was made of these requests. Payment of these emergency assistance grants was not made until July 5, 1994, after the commencement of this lawsuit—fifty-one days after the first request for emergency assistance.

Ms. Brown's affidavit details day by day her efforts to obtain emergency assistance from the Fulton ISC. No affidavit from her caseworker or any other employee of her ISC is presented contradicting plaintiff's statements that she spoke numerous times with her caseworker both in person and on the telephone outlining her predicament. Defendants' only response to Ms. Brown's description of the callous treatment she received provides more support for the contention that the City Defendants fail lamentably to comply with federal and state requirements for emergency assistance. According to a deputy commissioner of the City Agency, no one was assigned to Ms. Brown's AFDC case until a week after Ms. Brown first applied for emergency assistance.[5] Instead, defendants state that Ms. Brown's case file does not record her requests, a circumstance which serves more to describe the problem than explain it away.

Ms. Brown avoided the termination of her electricity by borrowing money from a friend. At the time the lawsuit commenced in June through the date payment of her rent arrears was made, she lived in fear of eviction.

*Xiomara Boza.* Ms. Boza is a 36–year–old resident of Brooklyn who lives with her three children, aged 15, 14, and 11 years old. Since 1991 the three children have been recipients of AFDC benefits through the Linden ISC. The caseworker assigned to their case is a Mr. Jones. Plaintiff Boza's affidavit states that since 1992 she has been seeking to be added to her children's family unit. In March 1994 she met with her caseworker and gave him a written request to be added to her family unit as a recipient of benefits together with all documentation necessary to verify her need and eligibility. On April 1, 1994, her children's case was closed by the City Agency because of Ms. Boza's failure to attend an interview to recertify her children's eligibility. On May 1, 1994, the case was reopened and the children's benefits restored retroactively to the date of closing. At the same time, Ms. Boza resubmitted her request to the supervisor of her caseworker to be added to her children's family unit. On June 17, 1994, immediately prior to the filing of this case, she was added to the family unit and issued retroactive supplemental public assistance for the period May 2, 1993, through July 1, 1994—the period in excess of one year during which her request had been pending.

No affidavit from Ms. Boza's caseworker, Mr. Jones, or his supervisor is submitted to contradict Ms. Boza's account of her treatment by the Linden ISC. Ms. Boza's statements are supported by an affidavit of her attorney that the attorney also tried unsuc-

---

5. The deputy commissioner concludes from this, somewhat illogically, that plaintiff could not have requested assistance prior to that date.

cessfully to contact the caseworker and the caseworker's supervisor without success to determine why Ms. Boza's request had not been acted on. Defendants instead confine themselves to attacking Ms. Boza's veracity (about matters which they do not in fact dispute) by referring to statements by Ms. Boza in September 1993 in connection with a recertification review that she did not want to apply for public assistance and to admissions allegedly made by Ms. Boza in August 1994 to officials of the Bureau of Fraud Investigation that she had used two names, her maiden and her married names, in applying for public assistance and supplied false information to the City Agency under circumstances which are not described.

Defendants state that they have been unable to locate any "application for additional benefits" in plaintiff Boza's file. Again, defendants' assertions are more descriptive than explanatory. Their assertion may be an unfortunate play on words (since elsewhere defendants contend that the term application is a technical one which only refers to the initial request by a member of a family unit for benefits). In any event, defendants' statement supports plaintiff's uncontradicted statement that she was told by her caseworker that he had lost her application, or it may be explained by the deposition testimony of the deputy commissioner:

Q. When a person requests to add somebody to the budget, does the recipient fill out an application form?

A. No, they do not.

 * * * * * *

Q. Other than an application form, are there any other forms that the recipient might fill out and sign at the time that they're seeking to add somebody to their grant?

A. No.

 * * * * * *

Q. In the instance of a request to add somebody to the budget, how long after the request is made is the work supposed to be completed?

A. Anywhere from three to ten days.

Blaustein Deposition at 247–48.

Over the year during which Ms. Boza's request for benefits was pending, she received a 72–hour eviction notice, her children have gone without clothing, and she herself has had to suspend her pursuit of a degree in radiology at Hostos Community College because of her inability to pay for after-school childcare for her eleven-year-old son.

*Reba Bedford.* Plaintiff Bedford is a 42–year-old mother of two children, aged 13 and 14. Her family unit received AFDC benefits until December 13, 1993, when it was closed for reasons not apparent from the record. In March 1994 the case was reopened and eligibility restored. Ms. Bedford states under oath that she immediately went to her ISC for an emergency grant to avoid cutoff of her electricity by Con Edison. She was seen by a Mr. Parks in the absence of her caseworker. He instructed her to obtain a letter from Con Edison confirming her situation. Ms. Bedford did as requested and, on April 4, 1994, personally delivered the letter to Mr. Parks who assured her that her services would not be cut-off, an assurance which he repeated a month later when Ms. Bedford called again. On June 14, 1994, plaintiff's gas and electric services were terminated. She at once went to Con Edison where she received a second letter confirming her situation, which she immediately took to her ISC. There she attempted to give the letter to Mr. Parks, who stated that he was no longer her caseworker, that a Mr. Maden was her new caseworker, and that the letter should be given to Mr. Maden. When Mr. Maden refused to accept the letter Ms. Bedford returned to her home, where her 13– and 14–year-olds were in the dark.

The family spent the night by candlelight. The utilities cutoff resulted in the loss of perishables stored in her freezer which she lacked the gas to cook.[6] On June 16, the day after signing her affidavit in support of preliminary injunctive relief in this case, her

---

**6.** Ironically, the perishables in the freezer had been purchased with government supplied food stamps.

request for emergency assistance was granted and her utilities arrears paid.

Defendants confine themselves in responding to plaintiff Bedford's affidavit with the statement that her "case record reflects that she did not provide any documentation regarding her need for an emergency utilities grant until June 15, 1994, the day after her electricity was allegedly [sic] shut off." No affidavit is presented from Mr. Parks or Mr. Maden contradicting plaintiff's statements that she requested assistance and provided verification of her situation by hand. Nor do defendants explain why, if Ms. Bedford had difficulty in obtaining the necessary information from Con Edison, her caseworker did not as required by state regulations assist her in obtaining the required information using the Con Edison liaison on duty at the ISC. 18 N.Y.C.R.R. § 351.5; *see Robinson v. Grinker,* Index No. 40610/87, Sup.Ct. N.Y.Cty. Over two months elapsed before defendants acted on plaintiff's emergency request and then only after it was too late to avoid the emergency.[7]

*Olga Corredor.* Olga Corredor is a 30-year-old mother of two, a twelve-year-old girl and a sixteen-month-old baby. She supports herself with $291 per month in assistance under the AFDC program and with $295 per month under the food stamp program. In April her telephone was cut off for non-payment.

In June 1994, when this action commenced, Ms. Corredor was eight months pregnant. She suffered from gestational diabetes during pregnancy and required a 2,200 calorie-a-day diet, which she could not afford in the absence of a $50 monthly special needs grant available under 18 N.Y.C.R.R. § 352.7(k).

It is undisputed that plaintiff Corredor requested such a grant from her caseworker, again a Mr. Parks, when she was three months pregnant.[8] The parties dispute whether Corredor was told at this meeting that she would only be eligible for such payments after she became six months pregnant. (Under § 352.7(k) she was entitled to benefits after she was four months pregnant. Plaintiff says that Parks told her she had to wait until she was six months pregnant.) In all events, no statement is offered, hearsay or otherwise, disputing plaintiff's detailed account of her in-person delivery to her ISC of her doctor's verification of her pregnancy in May 1994 and her two telephonic confirmations of that delivery with Parks later that day and the following month. Not until the eve of this lawsuit, in her eighth month of pregnancy, did plaintiff get the pregnancy allowance she had sought.

Although the grant was retroactive to her fourth month of pregnancy (*i.e.,* $200), Ms. Corredor has suffered irreparable injury to her and her child through the deprivation of the funds necessary to buy medically required nutrition during a substantial portion of her pregnancy.[9]

*Jacqueline Quinones.* Plaintiff Quinones is a resident of Brooklyn who is a recipient of AFDC benefits through the Waverly ISC. Ms. Quinones gave birth to a daughter in March 1994. Shortly after the child's birth, she requested that the child be added to her public assistance case. Defendants do not dispute this or plaintiff Quinones' statements that she repeated her request on numerous

---

7. According to Ms. Bedford, her caseworker responded to her request for help, after a night spent without gas or electricity, that she no longer had an emergency since her services were already cut off.

8. Again, no affidavit from Parks denying the truth of plaintiff's account of her dealings with him is presented, although Parks is clearly available to give such an affidavit since he is quoted as having denied to the deputy commissioner that he gave erroneous information to plaintiff concerning her eligibility for pregnancy benefits.

9. Defendants obtusely suggest that plaintiff's request for a grant in February or March, when she was only three months pregnant, was in some fashion inappropriate because she would not become eligible for benefits until the next month. This approach, which essentially treats a **request** for assistance as a nullity up until the point eligibility for the request is verified, may go a long way towards explaining why the City Agency appears to pay no attention at all to state and federal time periods which commence with the time of **request** not the time of **verification.** The clear intent of the regulation is to assure that the time-consuming process of investigation and verification is started promptly following a request.

occasions, culminating in a request by her lawyers on June 22, 1994, immediately before the commencement of this case.

Defendants state in an affidavit that a review of their records, which were not submitted with their papers, reveals that a determination was made that the child should be added to Quinones' case on June 22, 1994, the same day plaintiff's lawyer requested the relief. Plaintiff's lawyers dispute this and attach to their papers a notice of intent to change benefits purported to be signed by Ms. Quinones' caseworker and supervisor and dated July 29, 1994. Whether a decision on plaintiff Quinones' request took three or four months seems academic since it is undisputed that as of October 11, 1994, plaintiff Quinones had not received the increase in her semi-monthly AFDC grant from $63 to $179 or the increase in her food stamps from $189 to $295 per month to which the change in her budget entitled her.[10] As a result, Ms. Quinones and her husband are doing without necessities for themselves in order to feed their baby and are living in fear of eviction, on the charity of neighbors, relatives, and friends.

*Michelle Martindale.* Plaintiff Martindale resides in Brooklyn and receives public assistance through the Linden ISC. Since November 1993 she has taken responsibility for the care of her nephew and on May 13, 1994, became the child's legal guardian.

On May 18, 1994, Ms. Martindale took her guardianship papers to her ISC and, it is undisputed, completed an application for AFDC benefits as the legally responsible aunt of a minor nephew. 18 N.Y.C.R.R. § 369.1(b). An untimely decision was made to award her the benefits on June 25, 1994.[11] Despite the award and in violation of 18 N.Y.C.R.R. § 351.8(c)(3) ("[a] first payment must be made as soon as possible for AFDC

cases, but not later than within thirty days of the date of application"), Ms. Martindale had still not received her increased grant as of October 7, 1994. As a consequence she has been supporting her nephew and herself on a $352 per month home relief grant which has deprived the nephew, *inter alia,* of needed clothing for the new school year.

*Ingrid Armstrong.* Plaintiff Armstrong is a Brooklyn mother of two, whose youngest is two years old. She is a recipient of AFDC benefits through the Linden ISC.

Her affidavit presents a vivid and detailed account of rude, abrupt, and unfeeling treatment by the City Agency's overworked and harassed employees whose names she sets forth in her affidavit. Defendants offer no affidavits from the named caseworkers or other information to contradict her account.

Plaintiff Armstrong did not receive her bi-weekly checks for mid-June and early July 1994 and repeatedly attempted to contact her caseworker, the caseworker's supervisors, and others at her ISC to complain about and seek remedy for this lapse. When she called her caseworker, a Ms. Peterson, and related the situation to her, her caseworker told her she did not have time to look into the matter.[12] The following day when plaintiff called again her caseworker was out, and no one else would help her. On July 7, Ms. Peterson said she was behind in her paperwork and that plaintiff should call back the next day. On Friday, July 8, Ms. Peterson was again reported to be out. When plaintiff asked to speak to her supervisor, a Ms. Simmons, about her lost checks, the response "was very abrupt," and plaintiff was told to call again on Monday. When plaintiff explained that she had not received two bi-weekly payments, that her landlord had not been paid by the City Agency, and that she was without funds and needed an emergency

---

10. As noted above, New York regulations require that payment of increased benefits be made as part of the next pay period (here, bi-weekly) after the recipient is awarded the increase.

11. While federal regulations allow forty-five days for decisions on new applications for AFDC benefits, 45 C.F.R. § 206.10(a)(3), New York has, as permitted by the federal regulations, shortened this to thirty days. 18 N.Y.C.R.R. § 351.8(b).

12. As noted above, all that is required under state regulations to trigger the need for a prompt initiation of an investigation is "an indication . . . of a change of circumstances." 18 N.Y.C.R.R. § 351.22(e). The theft or loss of a bi-weekly check constitutes a special need under 18 N.Y.C.R.R. § 352.7(g), which accordingly represented a change of circumstances warranting a prompt investigation.

grant to feed herself and her two-year-old child, Ms. Simmons "hung up on me." Demonstrating the gravity of the situation, plaintiff then called the City Agency's administrative offices where she was told to see a Mr. Stadler the following Monday. When she appeared she was told that Mr. Stadler was out. She left a letter addressed to him explaining the situation in detail.

The same day she again tried to make arrangements by telephone to meet with her caseworker. Ms. Peterson responded that "she did not see 'walk-ins' and hung up the telephone." On July 12, 1994, she called Mr. Stadler's office and was told by his secretary that he did not have time to read her letter and that plaintiff should contact her caseworker. The same day and the day following, plaintiff again called her caseworker. Finally, on July 14, 1994, nine days after requesting emergency relief, she obtained it. She received no bi-weekly check July 17, but on August 1 and thereafter she began to receive her benefits again regularly. Payments for the missed checks for June 17, July 2, and July 17, were not made until early October 1994.[13]

*Zenaida Pichardo.* Plaintiffs have also submitted an affidavit from Zenaida Pichardo, who is not a named party to this action. Ms. Pichardo requested a grant for moving expenses on July 7, 1994, an expense covered by AFDC grants, for the purpose of moving her four children and herself from a studio apartment to a two-bedroom apartment in Connecticut. She submitted the appropriate verification on July 14, 1994, after traveling twice to Connecticut to get the required documentation from a recalcitrant landlord.

The City Defendants do not contest that appropriate documentation was submitted as of July 14, 1994, and concede that this request was not even referred for investigation until August 8, 1994, which is not "promptly" under any definition of the word. 18 N.Y.C.R.R. § 351.22(e). While it is clear that the investigation was not completed within 30 days of the request or "indication of ... change in degree of need," Ms. Pichardo eventually received her moving grant. However, the City Agency did not issue the necessary assistance until September 1994, again in derogation of state regulations. 18 N.Y.C.R.R. § 351.22(e).

While certain general patterns emerge from the individual cases outlined above, plaintiffs have also submitted quality control reports prepared by the defendant City Agency which reflect on a broader scale many of the problems illustrated by the plaintiffs' affidavits. These reports, prepared by the City Agency's own internal investigative group, cover the period January 8, 1991, through April 27, 1994. The reports take note of numerous ISC's where caseworkers routinely carried caseloads in excess of 175 cases [14] together with corresponding difficulties at these ISC's in processing applications in a timely manner.

A Crotona ISC report from March 1993 noted numerous delays in the undercare section in processing cases in a timely fashion and that "[t]he workers indicated that supervisors were delinquent in signing off [on] cases resulting in cases piling up on [a] supervisor's desk while supervisors state that the workers were not completing cases in a timely fashion." The report stressed the importance of monitoring timeliness and noted that "undercare workers [were] unaware of any specific time frame for reviewing newly accepted cases." The center had two full caseloads of 175 cases each that had no caseworker assigned to them and a backlog in both the application and undercare sections.

---

**13.** Illustrating the geometric progression of injury created by failure to attend promptly to a "change of circumstances" such as plaintiff Armstrong's, she also lost her rent payments, food stamps, and medicaid eligibility as a result of the same error which resulted in the loss of her AFDC benefits. Since Ms. Armstrong's two-year-old became sick, a circumstance she called to her caseworker's attention, her situation constituted a dire emergency under any definition.

**14.** The 175 caseload figure is the product of collective bargaining between the city and the union representing the caseworkers. No study appears to have been done to determine the impact of such a caseload on the defendants' ability to meet federal and state timelines.

A report from July 1992 with respect to the Amsterdam ISC took note of an average caseload of 275 to 328 cases per eligibility specialist! The quality control report noted that "[d]ue to heavy caseloads, [specialists] often do not review the cases within the given seven day period."

At the Wyckoff ISC, a December 1992 report noted a backlog of 600 cases awaiting processing with "no specific plans in place to work off this backlog." Paperwork in the undercare section was not processed in a timely manner, and specialists and supervisors were not adhering to time rules. Moreover, the report took note of numerous cases that were closed in error.

A report from November 1992 with respect to the Linden ISC, where plaintiffs Boza and Armstrong cases are handled, noted that, because of a backlog in applications, undercare specialists were forced to help eliminate that backlog. As a result, aid recipients had trouble seeing their caseworker to address new issues, such as "evictions, utility shutoffs, and newborns not added to the case, [and] rent not issued".

A May 1991 report with respect to the Roosevelt Drive ISC noted that "35% of the cases [are] not being submitted in a timely manner." A December 1991 report with respect to the Boulevard ISC noted that because of understaffing recipients "are experiencing difficulty contacting their workers by phone" and that recipients have difficulty informing their caseworkers about impending emergencies. A February 1992 report with respect to the Fordham ISC noted that in order to meet time deadlines supervisors "do not review cases carefully." A January 1991 report on the Waverly ISC, where plaintiff Quinones' case was handled, noted that, while the undercare section was properly addressing the needs of current recipients, the applications section was holding onto newly completed applications for too long a period of time. The report noted further that, while the application section "functions well in terms of deadlines ... many cases are processed in poor condition." At the St. Nich-

olas ISC, a December 1991 report noted that, while the supervisory sign-off deadline was generally met, the inability of some caseworkers to complete their work in a timely manner impaired the ability of the supervisors to do an accurate case review. A constant refrain in the reports is the inability of clients to reach their caseworkers by telephone and the absence of sufficient personnel to staff the reception desk.

Plaintiffs also introduce affidavits from individuals at two social services advocacy groups, the Citizens Advice Bureau of The Bronx and the Northern Manhattan Improvement Corporation, and from Gwendolyn Richardson, an official for the union representing the group supervisors. Given the interests of these groups in the issues under consideration, the affidavits are not entitled to much weight in and of themselves. The affidavits do, however, corroborate much that appears from the city's own reports. These affidavits note that the ISC's routinely fail to act timely on requests by AFDC recipients for emergency grants and requests to add additional individuals to their budget.

The affidavit of Deputy Commissioner Burton Blaustein does not so much take issue with these complaints of untimeliness as seek to lay the blame on the recipients. Thus, Mr. Blaustein notes that "NYC–DSS typically makes EAF eligibility determinations and issues emergency checks on the same day that the recipient verifies the need for the grant," and "NYC–DSS generally processes and issues increases to AFDC grants, including special benefits, within five to ten days from the date of the request, provided verification is produced at the time of the request." The problems highlighted by plaintiffs' affidavits and the city's quality control reports are not, however, for the most part problems of delay after verification is established.[15] Instead, the problems arise from a recipient's inability to get the attention of a caseworker to find out what verification is required and to initiate an immediate or thirty-day investigation in the course of which

---

**15.** Cases like those presented by Quinones and Martindale, however, **do** involve lengthy unexplained delay in getting payment **after** verification.

verification is established.[16] Indeed, the City Defendants appear to consider what both federal and state regulations treat as the trigger event, the "indication of change of circumstances" 18 N.Y.C.R.R. § 351.22(e) or "report which indicates a change of circumstances," 45 C.F.R. § 206.10(a)(9)(ii), which starts the period of time for prompt action running, as though it was an event of little significance unless accompanied by "verification" that the change of circumstances has occurred.[17]

### The 1994 Redeployment Plan

In May 1994, the defendant Mayor issued the City of New York Executive Budget Plan for fiscal year 1995 which proposed, *inter alia*, the reduction or redeployment to other areas of personnel in the defendant City Agency responsible for processing requests for emergency and other change of circumstances benefits under the AFDC program. While portions of the budget plan were rejected by the New York City Council, other portions are scheduled to be put into effect commencing November 1, 1994.

Plaintiffs do not take issue with much of this plan. Specifically, they do not object to a restructuring of the 39 ISC's which will merge the application and undercare sections, increasing flexibility of the City Agency in responding to needs in both the application and undercare areas. Plaintiffs also do not object, at least at this time, to the redeployment or elimination of certain technical support personnel.

Plaintiffs do, however, object to a portion of the City's redeployment plan which will reduce by close to one-third the number of group supervisors assigned to ISC's to supervise AFDC assistance. Supervisory approval is required of decisions with regard to AFDC under state regulation as follows:

> **Supervisory review and approval.** The findings of the investigation together with the recommendations for case action shall be reviewed and approved by the supervisor. Supervisory approval shall be indicated by a dated signature in the case record. Supervisory approval shall be based upon review of all available information pertaining to eligibility and the amount of entitlement. It shall include approval of decisions to deny public assistance as well as decisions to change a grant or to refer an applicant or recipient for services.

18 N.Y.C.R.R. § 351.7.[18]

In an effort to compensate for this substantial cut in supervision,[19] defendants' redeployment plan envisages two modifications of existing procedures. First, one in ten caseworkers or eligibility specialists, presumably those most experienced or capable, will assume along with his or her regular caseload, supervisory functions over other caseworkers and the title "super eligibility specialist." Second, there will be a cutback in matters requiring review by a supervisor or, in other words, an expansion in the number of decisions that can be made by a casework-

16. Defendants also paint with too broad a brush in suggesting that the burden is on the recipient to establish the need for emergency or other benefits. Both federal and state regulations make clear that the caseworker has substantial responsibilities both to explain to the recipient what verification is required and to assist the recipient in dealing with third parties (such as Con Edison or reluctant landlords) who are slow to assist the recipient in obtaining verification. *See, e.g.,* 18 N.Y.C.R.R. § 351.5, 351.20(b)(1), (2), and (4).

17. Because so little significance is attributed to the initial "indication" or "report which indicates a change of circumstances," defendants appear unable to furnish any data on the timeliness of investigations, that is, the time from request for benefits to verification. Moreover, no procedure seems in place requiring that, upon receiving a report of change of circumstances, a caseworker establish a schedule for completion of the investigation with a clear statement of what is required from whom at each stage of the process. *See, e.g.,* Model Plan for Reduction of Expense and Delay in Civil Cases at 354, 356 (American Law Institute 1993); Civil Justice Reform Committee, Expense and Delay Reduction Plan, *Massachusetts Lawyers Weekly* (Jan. 20, 1992) at 52.

18. As noted below, defendants somewhat dubiously interpret this regulation to permit them to dispense with supervisory review of decisions by caseworkers to deny a change of grant while requiring such review where a change of grant is recommended.

19. The ratio of group supervisors to eligibility specialists will increase from the current 1 to 5 to a ratio of 1 to 10.

er alone, without supervisory review. Included in this category of unreviewed decisionmaking will be decisions continuing eligibility of AFDC recipients after the periodic investigation required by state regulations. Also included in the category of unreviewed determinations, however, will be determinations to **deny** requests for emergency relief, special needs allowances, or other requests for benefits because of a change of circumstances. Since supervisory review will continue to be required for **grants** of such benefits, the burden of increased error from lack of supervision will fall unequally on AFDC recipients seeking an adjustment, rather than falling equally on such AFDC recipients and on those concerned to protect the public purse from unjustified awards.

Defendants announce that the redeployment, which will make 618 employees who in the past have worked exclusively on new applications available to work on both new applications and undercare requests, will permit all eligibility specialists to carry a maximum caseload of 175 undercare cases [20] plus two non-emergency initial applications a week or eight to ten new applications a month. This corresponds to the figure obtained by plaintiffs by dividing the total number of 1994 public assistance cases of 555,221 by the projected number of eligibility specialists, which results in a total of 184 cases per specialist.

## DISCUSSION

 In order for a preliminary injunction to issue, plaintiffs must demonstrate irreparable harm and a likelihood of success on the merits. *See Communications Workers of America, Dist. One, AFL–CIO v. NYNEX Corp.*, 898 F.2d 887, 891 (2d Cir.1990); *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.*, 596 F.2d 70, 72 (2d Cir.1979) (per curiam). It is not sufficient to obtain preliminary relief in an action such as this to establish serious questions going to the merits since, where "a preliminary injunction 'seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory

scheme,' the less rigorous fair-ground-for-litigation standard should not be applied." *Sweeney v. Bane*, 996 F.2d 1384, 1388 (2d Cir.1993) (quoting *Plaza Health Labs, Inc. v. Perales*, 878 F.2d 577, 580 (2d Cir.1989)).

## Irreparable Harm

 The showing of irreparable harm is the "single most important prerequisite for the issuance of a preliminary injunction," *Bell and Howell v. Masel Supply Co.*, 719 F.2d 42, 45 (2d Cir.1983), and the moving party must show that injury is likely before the other requirements for an injunction will be considered. Irreparable harm must be shown to be imminent, not remote or speculative, and the injury must be such that it cannot be fully remedied by monetary damages. *Tucker Anthony Realty Corp. v. Schlesinger*, 888 F.2d 969, 975 (2d Cir.1989).

 Irreparable harm is injury for which a monetary award cannot compensate. *Studebaker Corp. v. Gittlin*, 360 F.2d 692 (2d Cir.1966). A "substantial loss of income" may be an irreparable injury if there is no way to recover the damages resulting from the lost income. *New York Patho. & X–Ray Labs., Inc. v. Immigration and Naturalization Service*, 523 F.2d 79, 81 (2d Cir.1975).

It is generally recognized that denying welfare benefits to a qualified recipient "may deprive an eligible recipient of the very means by which to live." *Goldberg v. Kelly*, 397 U.S. 254, 264, 90 S.Ct. 1011, 1018, 25 L.Ed.2d 287 (1970). Since such a person "lacks independent resources, his situation becomes immediately desperate." *Id.* This is especially true with respect to EAF assistance, which is intended to aid families to avoid immediate destitution of a child. 45 C.F.R. § 233.120. Indeed, in such instances, loss of even a small portion of welfare benefits can constitute irreparable injury warranting issuance of a preliminary injunction. *See, e.g., Hurley v. Toia*, 432 F.Supp. 1170, 1176 (S.D.N.Y.) (reductions and termination of Home Relief benefits constitutes irreparable injury), *aff'd*, 573 F.2d 1291 (2d Cir.1977);

---

**20.** As noted, the 175 caseload is the product of collective bargaining with the union representing the eligibility specialists.

*Boddie v. Wyman,* 323 F.Supp. 1189, 1193 (N.D.N.Y.) ("Welfare provides the means to qualified recipients to obtain the necessary food, clothing, housing and medical care. There is no doubt from the affidavits supporting the motion for preliminary relief that the differences sought in payments by the plaintiff are extremely important in respect to these things daily and in that sense when the day passes the injury or harm that may occur is irreparable."), *aff'd,* 434 F.2d 1207 (2d Cir.1970), *aff'd,* 402 U.S. 991, 91 S.Ct. 2168, 29 L.Ed.2d 157 (1971).

For plaintiffs and members of the plaintiff class, public assistance benefits are the essential source of support that permit them to survive. The affidavits submitted from the named plaintiffs vividly portray the irreparable consequences to them and their families and infant children when welfare moneys are not forthcoming in a timely fashion: going without food and clothing, lack of medicine for sick family members, risk of fire from candles used to replace electric light, and fears of eviction and foreclosure.

The State Defendant suggests that no irreparable injury is threatened and that the case is moot because the named party-plaintiffs have, since the commencement of this lawsuit, had their AFDC and EAF applications granted. As noted above, even this statement is debatable since, as of the date of the argument of these motions, two plaintiffs were still awaiting checks for benefits indisputably due them.

■ In all events, the fact that plaintiffs had received their unlawfully delayed benefits after the lawsuit was commenced does not make this action moot. Instead, "certification may be deemed to relate back to the filing of the complaint in order to avoid mooting the entire controversy." *Robidoux v. Celani,* 987 F.2d 931, 939 (2d Cir.1993) (citing *County of Riverside v. McLaughlin,* 500 U.S. 44, 50–52, 111 S.Ct. 1661, 1667, 114 L.Ed.2d 49 (1991)). Since this action will be certified as a class action, even if the named plaintiffs

are no longer suffering the harm alleged, since others similarly situated are, the controversy is not moot. *See, e.g., Roe v. Wade,* 410 U.S. 113, 125, 93 S.Ct. 705, 712–13, 35 L.Ed.2d 147 (1973).

The facts established by plaintiffs' affidavits and the city's quality control reports demonstrate a continuing threat of irreparable injury in the future to plaintiffs and their class unless preliminary injunctive relief is forthcoming. Pregnancies among the thousands of AFDC families may be expected to generate new special need requests everyday; lost and stolen checks, utility cutoffs, eviction notices, and foreclosures are also reasonably foreseeable everyday events generating more requests requiring timely processing in order to avoid irreparable injury. Without a timely processing of benefits, plaintiffs individually and the class they represent clearly risk irreparable injury unless a preliminary injunction is issued.[21]

### Likelihood of Success

■ The standard by which to judge likelihood of success is whether the plaintiffs "make a showing that the probability of [their] prevailing is better than fifty percent. There may be considerable room for doubt." *Eng v. Smith,* 849 F.2d 80, 82 (2d Cir.1988) (quoting *Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025 (2d Cir.1985)). The City Defendants argue that a heightened level of scrutiny—namely, a substantial likelihood of success—should be applied because the preliminary relief sought is identical to the ultimate relief sought. Plaintiffs, however, seek more in the way of ultimate relief than they seek preliminarily. Ultimately, plaintiffs seek, *inter alia,* declaratory relief declaring that defendants are in derogation of federal and state law and an injunction requiring defendants to timely process applications for benefits under penalty of contempt. All that plaintiffs are entitled to at this stage is an injunction against the redeployment of a limited number of City Agency employees responsible for administering the AFDC and

---

**21.** The City Defendants argue that no irreparable injury exists since (i) requests for additional benefits do not need to be processed within thirty days and (ii) the redeployment staffing plan will ensure that applications are timely processed.

Since these arguments actually concern the likelihood of success on the merits and not the irreparable injury suffered by an untimely determination of benefits, they will be addressed below.

EAF programs and efforts to ensure that future applications for benefits will, during the pendency of this action, be dealt with in a timely fashion.

■ Where a preliminary injunction merely seeks to maintain the status quo prior to an ultimate determination on the merits, the heightened standard of scrutiny will not apply. *Eng v. Smith*, 849 F.2d at 82. In *Eng*, a preliminary injunction that sought to compel defendants to implement a scheme for providing safeguards to mentally ill prison inmates did not "grant[ ] the movant substantially all the relief he ultimately seeks." 849 F.2d at 82. Similarly, here, preliminary relief would not be complete because the injunction sought by plaintiffs would end if their claims ultimately proved to be unsuccessful. *Eng*, 849 F.2d at 82; *see also Young v. New York City Transit Authority*, 729 F.Supp. 341, 348 (S.D.N.Y.), *rev'd on other grounds*, 903 F.2d 146 (2d Cir), *cert. denied*, 498 U.S. 984, 111 S.Ct. 516, 112 L.Ed.2d 528 (1990). However, even if heightened scrutiny is required, plaintiffs' showing establishes a substantial likelihood of success.

Plaintiffs essentially seek two preliminary injunctions: (1) directing defendants to process requests for AFDC benefits in a manner reasonably calculated to grant or deny the requests within thirty days, in the case of non-emergency requests, and forthwith, in the case of requests covered by EAF, and to make payment of such grants at the next possible pay period, or forthwith in the case of EAF requests; and (2) enjoining defendants from reducing the size of the supervisory staff responsible for reviewing such requests.

With regard to the first injunction, it is clear that defendants have a legal duty to process the applications for AFDC and EAF benefits in a timely manner. Federal law requires the redetermination of AFDC benefits "promptly, after a report is obtained which indicates a change in the individual's circumstances," 45 C.F.R. § 206.10(a)(9)(ii), and state law specifies that "action shall be taken to review these situations as they occur. An investigation shall be initiated promptly and completed within 30 days." 18 N.Y.C.R.R. § 351.8(e). Both federal and state law require that eligibility for EAF must be determined forthwith and payment made immediately if eligibility is established. *See* 45 C.F.R. § 233.120; New York State Department of Social Services Administrative Directives 87 ADM–18, 86 ADM–7, and 75 ADM–78. Finally, state regulations require that "when the verified data indicates an increase in need, action shall be taken immediately to increase the grant for the next pay period possible." 18 N.Y.C.R.R. § 351.22(f).

■ While federal law does not require a state to participate in the dissemination of AFDC and EAF benefits, once a state decides to participate in the program, it must comply with applicable federal regulations. *Rothstein v. Wyman*, 467 F.2d 226, 232 (2d Cir.1972) ("A state is not legally obligated to participate in [federally funded assistance programs]; if it does, it must comply with federal requirements."), *cert. denied*, 411 U.S. 921, 93 S.Ct. 1552, 36 L.Ed.2d 315 (1973).

The evidence produced by the parties establishes that it is substantially more likely than not that the City Agency fails to process requests for an increase in AFDC benefits because of a change in circumstances, emergency, or special needs by the plaintiff class in the time periods required by law. Moreover, even after becoming aware of the named plaintiffs' predicament at supervisory levels, the City Agency has been unable to provide benefits in a timely manner. With respect to four of the named plaintiffs, Brown, Quinones, Martindale, and Armstrong, the City Defendants' issuance of checks to these individuals still was not accomplished within the applicable time period. The absence of any explanation for these delays makes unavoidable the conclusion that the problem is institutional rather than exceptional.

■ It is within this Court's power to order the state and city agencies to process AFDC and EAF applications in a timely manner. *Class v. Norton*, 376 F.Supp. 496 (D.Conn.) (ordering state welfare department to make determinations of eligibility within time frame ordered by statute and to pay

benefits to any party whose applications are still pending at the end of the statutory period), *aff'd in part, rev'd in part,* 505 F.2d 123 (2d Cir.1974). Since the evidence establishes that it is substantially more likely than not that defendants have been failing to process applications for AFDC and EAF benefits to the plaintiff class in a timely manner, this Court "has a duty to fashion appropriate injunctive relief" to ensure so far as practicable that the processing of such applications does not exceed stipulated time limits. *Barnett v. Bowen,* 794 F.2d 17, 23 (2d Cir.1986).

█ Accordingly, defendants will be preliminarily enjoined during the pendency of this action to ensure that AFDC and EAF benefits are provided in a timely fashion and specifically directed to begin the preparation of a plan for the prompt disposition of change of circumstance requests for AFDC and EAF assistance.

The second injunction seeks to stay implementation of the City Agency's redeployment program pending the trial of this action. Plaintiffs do not contest that the merger of the application and undercare eligibility specialists roles will have the positive effect of saving money and increasing the efficiencies of the ISC units. The aspect of the redeployment plan that plaintiffs seek to enjoin is the reduction in the number of group supervisors.

It appears an inevitable consequence of the substantial decrease in supervision that, all else being equal, the time within which the claims of the plaintiff class are processed will (1) increase rather than (2) decrease or stay the same. Some improvement in processing of claims can be anticipated from the merging of the application and undercare sections of the ISC because of the increased flexibility of supervisors to place personnel where the need is greatest. However, it is not at all clear whether this will improve the processing of requests currently made to undercare specialists or the processing of new applications or both, since the city's quality control reports note a lack of timeliness in handling new cases as well as old ones. In all events, whatever benefits can be anticipated from the increase in flexibility will be substantially offset by the increased supervisory work to be assumed by one out of ten caseworkers to make up for the loss of supervision resulting from cutting the supervisory staff by one-third. In addition, as noted, the increased rate of error in determinations which it can be anticipated will flow from a cutback in supervision will fall with special impact on the individuals seeking an increase in benefits since the errors that result in a denial of benefits will not be subject to a supervisor's review but instead to the more time-consuming review available through a fair hearing.

█ This is not to say that a cutback in supervision can under no circumstances go ahead. The underlying problem of lack of timeliness in considering the claims of the plaintiff class appears to be the confused manner in which requests for benefits are handled. Rules for initiating an investigation, scheduling its disposition, allocating responsibilities for verification, and monitoring performance appear either not to exist or not to be followed. However, in the absence of a plan to speed up the disposition of cases through orderly procedures, adding any increased burden on the already overworked caseworkers will slow down disposition rates rather than improve them. As a result, an injunction prohibiting the cutback or redeployment of supervisors is necessary. However, such an injunction will be provisional and may be revisited if improvements in the speedy disposition of cases can be made.

### Justiciability

█ The City Defendants contend that plaintiffs' request for preliminary injunctive relief is non-justiciable since it addresses a decision solely within the province of the executive and legislative branches to allocate funds and make budgetary decisions. As noted above, however, it seems altogether possible that the city can in time both save money and speed up its disposition rate. This decision does not require the City Defendants to spend money; it requires the City Defendants to resolve its fiscal problems in a fashion that complies with the law. *See, e.g., Dunn v. New York State Dep't of Labor,* 474 F.Supp. 269, 275 (S.D.N.Y.1979). It is within this Court's power to enjoin actions by an executive or legislative body which are

unconstitutional or violative of statutes or regulations. *Dandridge v. Williams,* 397 U.S. 471, 487, 90 S.Ct. 1153, 1162–63, 25 L.Ed.2d 491 (1970). Where the standards for a preliminary injunction are met, it is this Court's obligation to enjoin actions of a governmental body which are in violation of the law. *See, e.g., RAM v. Blum,* 533 F.Supp. 933, 939 (S.D.N.Y.1982); *Class v. Norton,* 376 F.Supp. at 501; *New York State Assoc. for Retarded Children v. Rockefeller,* 357 F.Supp. 752, 768 (E.D.N.Y.1973).

### Class Certification

■ Plaintiffs also seek a determination that this case can proceed as a class action on behalf of all residents of New York City who are recipients of AFDC and who have or will request change of circumstance grants under the AFDC and EAF programs and whose requests are not disposed of promptly. The City Defendants argue that the proposed class cannot be certified since the bounds of the class are not precisely drawn. Class actions, however, are an appropriate method of obtaining relief for applicants for welfare benefits whose applications are not processed in a timely fashion. *See, e.g., Haskins v. Stanton,* 794 F.2d 1273 (7th Cir.1986) (food stamps); *Barnett v. Bowen,* 794 F.2d 17 (2d Cir.1986) (disability benefits). A class is clearly delineated if confined to eligible recipients of a government aid program. *See, e.g., Ellender v. Schweiker,* 550 F.Supp. 1348, 1349 (S.D.N.Y.1982); *RAM v. Blum,* 533 F.Supp. at 938.[22]

■ The proposed class satisfies the requirements of Rule 23(a) of the Federal Rules of Civil Procedure relating to class actions. The class is so numerous, over 500,-000 individuals, as to make joinder of all members impracticable. Fed.R.Civ.P. 23(a)(1). There are questions of law and fact common to all members of the class, namely whether defendants are in derogation of their legal obligations under federal statutes to process applications for AFDC and EAF

benefits in a timely manner. Fed.R.Civ.P. 23(a)(2). The claims of the named plaintiffs are typical of those of the plaintiff class, to wit: each has suffered irreparable injuries as a result of untimely determination and payment of welfare benefits. Fed.R.Civ.P. 23(a)(3). Finally, the named plaintiffs will fairly and adequately protect the interests of the plaintiff class because the interests of the named parties coincide with the interests of the class as a whole, namely, to obtain speedy determination of welfare benefits, and the attorneys for the named plaintiffs are experienced class action counsel who will prosecute this action vigorously. Fed. R.Civ.P. 23(a)(4).

■ The City Defendants contend that there are no questions of fact common to the class as a whole and that the plaintiffs' claims are atypical by drawing attention to individual injuries suffered by each named plaintiff. However, the overarching questions of fact are common to all class members, namely, whether defendants have failed to make timely determinations of applications for AFDC and EAF benefits and whether irreparable injury has or will flow from the delay. *See, e.g., Escalera v. New York City Housing Authority,* 425 F.2d 853, 867 (2d Cir.), *cert. denied,* 400 U.S. 853, 91 S.Ct. 54, 27 L.Ed.2d 91 (1970). The existence of factual variations in the types of irreparable injury suffered or in the length of the delay does not preclude class certification. *Robidoux v. Celani,* 987 F.2d at 937; *Jane B. v. New York City Dep't of Soc. Serv.,* 117 F.R.D. 64, 70 (S.D.N.Y. 1987). The individual facts unique to each named plaintiff are merely methods of proving that ultimate fact. In *Jane B.,* the court addressed the propriety of a class action suit challenging conditions at two centers for adolescent girls with emotional problems. In deciding that commonality existed, the court held that,

> [a]lthough there may be factual differences among members of the class in that the

---

**22.** The City Defendants' reliance on *Rappaport v. Katz,* 62 F.R.D. 512 (S.D.N.Y.1974) is misplaced. There, the court refused to certify a class consisting of "all persons who wish and are legally entitled to be married by the Clerk of the City of New York," on the grounds that such a class was too amorphous to meet the requirements of Rule 23. The court there held that such a class "is subject to change from day to day." Here, however, the class is clearly definable and relatively constant.

educational, medical and other needs of the individuals vary, this does not preclude certification. Rather, as long as there is a common question [as to whether defendants have failed to provide plaintiffs with adequate medical, psychological, counseling and educational services], individual differences do not bar class treatment.

117 F.R.D. at 70; *see also Cutler v. Perales*, 128 F.R.D. 39, 45 (S.D.N.Y.1989) (commonality requirement met where all putative class members were concerned with same question of whether city agency was timely complying with Medicaid benefit decisions rendered by state agency); *Lewis v. Gross*, 663 F.Supp. 1164, 1167 (E.D.N.Y.1986) ("a single issue common to the class members is sufficient to satisfy the [commonality] requirement").

The standards for class certification under Federal Rule of Civil Procedure 23(b) have also been met. Rule 23(b)(2) provides:

> [A]n action may be maintained as a class action if the prerequisites of subdivision (a) are satisfied, and in addition: . . . the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class."

 Plaintiffs' complaint falls within Rule 23(b)(2). Defendants' failure to act is said to be institutional not merely a cumulation of individual cases. The final injunctive and declaratory relief requested here would inure to the benefit of all class members in gaining a timely processing of their applications for benefits.

 The State Defendant argues that class certification is nevertheless inappropriate under Rule 23(b)(2) since one plaintiff can pursue the requested injunctive and declaratory relief, and a ruling in that party's favor would inure to the benefit of all class members. The argument ignores the difference between the use of a judgment in this case as precedent and its use as an enforceable order. Contrary to defendants' contention, the principle of *stare decisis* does not operate to

adequately protect the putative class members and preclude certification of the class. Moreover, *stare decisis* is especially inappropriate as grounds for denying class certification where the defendants have not indicated whether they will abide by a court's decision should that court decide in favor of non-class plaintiffs. *Bizjak v. Blum*, 490 F.Supp. 1297 (N.D.N.Y.1980).[23] Moreover, the State Defendant ignores a long line of cases in this Circuit allowing class actions that seek to enjoin governmental action. *See, e.g., Robidoux v. Celani*, 987 F.2d at 937; *Barnett v. Bowen*, 794 F.2d 17; *Cutler v. Perales*, 128 F.R.D. at 45; *Jane B. v. New York City Dep't of Soc. Serv.*, 117 F.R.D. at 70; *Lewis v. Gross*, 663 F.Supp. at 1169; *Ellender v. Schweiker*, 550 F.Supp. at 1349; *RAM v. Blum*, 533 F.Supp. at 938; *see also Haskins v. Stanton*, 794 F.2d 1273 (7th Cir.1986).

The State Defendant's reliance on *Galvan v. Levine*, 490 F.2d 1255 (2d Cir.1973), *cert. denied*, 417 U.S. 936, 94 S.Ct. 2652, 41 L.Ed.2d 240 (1974), for the proposition that class actions are inappropriate in actions seeking to enjoin governmental action is misplaced. The court in *Galvan* merely held that a class action was not necessary since the defendant had already agreed that the underlying judgment against it would bind it with respect to all potential claimants. Here, however, defendants have not so agreed, making class certification necessary. *Bacon v. Toia*, 437 F.Supp. 1371, 1383 n. 11 (S.D.N.Y.1977), *aff'd*, 580 F.2d 1044 (2d Cir. 1978). In fact, the behavior of defendants in seeking to moot the claim of each named plaintiff without addressing the underlying deficiencies in the City Agency's processing of welfare applications demonstrates why a class action is needed here. *See Greklek v. Toia*, 565 F.2d 1259, 1261 (2d Cir.1977), *cert. denied*, 436 U.S. 962, 98 S.Ct. 3081, 57 L.Ed.2d 1128 (1978); *Jane B. v. New York City Dep't of Soc. Serv.*, 117 F.R.D. at 72.

Accordingly, for the reasons set forth herein, plaintiffs' motions for a preliminary injunction and class certification are granted.

SO ORDERED.

---

**23.** This is especially true here, where defendants have a history of failing to abide by court orders to provide relief to a class of plaintiffs. *See, e.g., RAM v. Blum*, 533 F.Supp. at 939; *Swift v.*

*Blum*, 502 F.Supp. 1140, 1143–44 (S.D.N.Y. 1980); *Montes v. Brezenoff*, 85 F.R.D. 130, 132 (S.D.N.Y.1980).

## PRELIMINARY INJUNCTION ORDER

For the reasons stated and upon the findings of fact and conclusions of law set forth in this Court's Memorandum Decision and Order dated October 27, 1994, it is hereby

ORDERED that defendants Rudolph W. Giuliani, as Mayor of the City of New York, and Marva L. Hammons, as Commissioner of the New York City Department of Social Services, their agents, servants, attorneys, employees, and all those in active concert and participation with them be, and they hereby are, pending further order of this Court or the trial of this matter:

(i) directed to commence forthwith preparation and implementation of a plan for the prompt disposition of requests by members of the plaintiff class for an increase in benefits because of changed circumstances under the Aid to Families with Dependant Children ("AFDC") and Emergency Assistance to Families ("EAF") programs in a manner reasonably calculated to complete requests for EAF grants and within thirty days in the case of other requests, and to pay grants of increased benefits immediately in the case of EAF grants and by the recipient's next scheduled pay period in the case of other grants; and

(ii) restrained from redeploying group supervisors responsible for reviewing such requests at defendants' Income Support Centers of the New York City Department of Social Services pursuant to the redeployment plan scheduled to take effect on November 1, 1994, without prejudice to an application by defendants to be relieved of this provision of this injunction upon a showing that the timely processing of requests for AFDC benefits will not be impaired by such redeployment; and it is further

ORDERED that, due to plaintiffs' indigency and inability to afford the cost of a bond, the effectiveness of this preliminary injunction is not conditioned upon the posting of a bond pursuant to Rule 65(c) of the Federal Rules of Civil Procedure.

SO ORDERED.