Juana MOREL, Elizabeth Simmons, Pamela Thomas, Norma Cintron, on their own behalf and on behalf of all others similarly situated, Plaintiffs,

v.

Rudolph W. GIULIANI, as Mayor of the City of New York; Marva Livingston Hammons, as Commissioner of the New York City Department of Social Services; and Michael J. Dowling, as Commissioner of the New York State Department of Social Services, Defendants.

No. 94 Civ. 4415 (JFK).

United States District Court, S.D. New York.

Jan. 4, 1995.

John C. Gray, Jr., Brooklyn Legal Services, Brooklyn, NY (Marc Cohan, of counsel), Scott A. Rosenberg, The Legal Aid Soc. Civ. Appeals & Law Reform Unit, New York City (Richard Blum, of counsel), Yisroel Schulman, New York Legal Assistance Group, Inc., New York City (Marti Copleman, of counsel), Arnold Cohen, Queens Legal Services Corp., New York City (Debra Berman, Jamaica, NY, of counsel), Marshall Greene, The Legal Aid Soc. Bronx Neighborhood Office, New York City (Ian F. Feldman, of counsel), for plaintiffs.

Paul A. Crotty, Corp. Counsel of City of New York, New York City (Ann Marie Vroman, of counsel), Dennis C. Vacco, Atty. Gen. of State of N.Y., Buffalo, NY (Robert F. Bacigalupi, New York City, of counsel), for defendants.

## OPINION AND ORDER

KEENAN, District Judge:

This is an action on behalf of a putative class of recipients of benefits under the Aid to Families with Dependant Children ("AFDC") program, 42 U.S.C. § 601 et seq., the federal Food Stamps program, 7 U.S.C. § 2011 et seq., and the New York State Home Relief program, New York State Soc. Serv.Law § 157 et seq. Jurisdiction exists under 28 U.S.C. § 1331. This Opinion and Order is filed pursuant to Federal Rules of Civil Procedure 23 and 65(d), the latter requiring the Court to set forth with specificity the factual findings and legal conclusions supporting its decision on an application for a preliminary injunction.

Plaintiffs claim that Defendant Dowling, former Commissioner of the New York State Department of Social Services (the "State agency"),[1] has failed to ensure that the State agency timely processes recipients' requests for administrative hearings. Plaintiffs also claim that Defendant Dowling has failed to adequately monitor Defendant Hammons, Commissioner of the New York City Department of Social Services (also known as the Human Resources Administration) (the "City agency"), and Defendant Giuliani (collectively "City Defendants") in the provision of "aid continuing" benefits, in violation of 45 C.F.R. § 206.10(a)(12), 7 C.F.R. § 271.4, and New York State Soc.Serv.Law §§ 20 & 34.

Plaintiffs claim that City Defendants regularly fail to provide timely aid continuing. Plaintiffs further claim that City Defendants have failed to provide sufficient staff at City agency to implement timely aid continuing in the present or near future, in violation of New York State Soc.Serv.Law §§ 61–62.

Currently before the Court is Plaintiffs' motion for certification of the proposed class, pursuant to Rule 23 of the Federal Rules of Civil Procedure. For the reasons stated below, Plaintiffs' motion is granted.

Also before the Court is Plaintiffs' motion for a preliminary injunction pursuant to Rule 65 of the Federal Rules of Civil Procedure. Plaintiffs seek an order requiring City agency to provide appropriate aid continuing to the named plaintiffs and members of the proposed class and enjoining City Defendants from further reducing the staff responsible for providing aid continuing pending implementation of a staffing plan which assures the provision of aid continuing benefits.

At the outset, the Court is well aware of the current struggles of State and City officials to provide public services in times of increasingly constrained resources. The Court is also aware of the many efforts to reform the delivery of many of these services. This opinion is in no way intended to inhibit or otherwise interfere with these necessary and desirable goals, so long as the actions taken in their service are not inconsistent with the constitutional, statutory, and regulatory standards which this Court is sworn to uphold.

Moreover, in measuring the conduct of State and City agencies against those stan-

---

1. The Court recognizes that Mary E. Glass is the new, temporary Commissioner of the State agency and that as such she may order changes in the procedures for requesting hearings and directing aid continuing benefits.

dards, the Court recognizes the wisdom of deferring to the expertise and accountability of local elected officials, agencies, and their representatives. This recognition, however, does not relieve the Court of its obligation to exercise its authority when presented with a clear, factual showing of violation. The Court, therefore, may not properly defer to the types of unsubstantiated assertions and illusory guarantees presented by Defendants. For this reason, as explained below, Plaintiffs' motion for preliminary injunction is provisionally granted.

### Background

**A. Applicable programs and aid continuing regulations**

This case involves three types of aid programs: Aid to Families with Dependent Children (AFDC), Food Stamps, and New York State Home Relief. AFDC is a cash assistance program for families with at least one minor child who has been deprived of parental support or care by reason of death, continued absence from the home, unemployment or physical or mental incapacity of a parent. *See* 42 U.S.C. § 601 *et seq.* The Food Stamp program provides cash substitutes to the low-income population in order to raise the level of nutrition among low income households, and thereby safeguard the health and well-being of the nation. *See* 7 U.S.C. § 2011 *et seq.* The New York State Home Relief program provides cash assistance to the poorest of the State's residents whose needs are not otherwise met by any other assistance program. *See* New York State Soc.Serv.Law § 157 *et seq.*

■ Recipients under each program have a constitutionally guaranteed right to have an administrative due process hearing to review an agency action affecting their benefits. *See Goldberg v. Kelly,* 397 U.S. 254, 264, 266–71, 90 S.Ct. 1011, 1018–19, 1019–22, 25 L.Ed.2d 287 (1970) (recipients of public assistance cannot be deprived of necessary benefits without pre-termination evidentiary hearing); 42 U.S.C. § 602(a)(4); 7 U.S.C. § 2020(e)(10); New York State Soc.Serv.Law § 22. Agency actions triggering this right include suspensions, discontinuances, recoupments, reductions, and restrictions of bene-

fits. Moreover recipients who timely request a fair hearing are entitled to a continuation of their benefits, known as "aid continuing," pending issuance of a hearing decision. *See* 45 C.F.R. § 205.10(a)(6), 7 C.F.R. § 273.15(k)(1), and 18 N.Y.C.R.R. § 358–3.6. A hearing request is timely if it is made within ten days of the notice to the recipient, before the effective date of the proposed action, or, if no notice was sent, when the request was made. *See* 45 C.F.R. §§ 205.10(a)(4) & 205.10(a)(6); 7 C.F.R. §§ 273.13(a)(1), 273.13(a)(3), & 273.15(k)(1); 18 N.Y.C.R.R. §§ 358–2.23 & 358–3.6(a)(1). Where a recipient has made a timely request but benefits were changed prior to the hearing, the agency is required to restore benefits pending the hearing decision. *See* 45 C.F.R. § 205.10(6); 7 C.F.R. § 273.15(k)(1); 18 N.Y.C.R.R. § 358–3.6(a)(1)(i)–(ii).

**B. The parties**

**1. Defendants**

Defendant Hammons is the Commissioner of the City agency, the local social services district responsible for providing benefits under the AFDC, Food Stamps, and Home Relief programs for New York City residents. *See* New York State Soc.Serv.Law §§ 61–62. Defendant Giuliani, as Mayor, is responsible for directing Defendant Hammons and the City agency. Defendant Dowling was the Commissioner of the State agency. The State agency determines eligibility for aid continuing within the procedures outlined below. The Commissioner is obligated under federal AFDC and Food Stamp regulations to supervise Defendant Hammons and to ensure that Defendant Hammons complies with applicable federal mandates. *See* 45 C.F.R. § 206.10(a)(12); 7 C.F.R. § 271.4; New York State Soc.Serv.Law §§ 20 & 34. The Commissioner also has statutory enforcement mechanisms at his disposal to ensure City agency compliance. *See* New York State Soc.Serv.Law §§ 20 & 34.

**2. Plaintiffs**

Juana Morel is a resident of the Bronx who received public assistance and food stamps. *See* Order to Show Cause of June

16, 1994, at App. C, Morel Statement ¶¶ 2–3.[2] Elizabeth Simmons and her son reside in Brooklyn and received AFDC and food stamps. *See id.* at App. D, Simmons Aff. ¶¶ 2–3.[3] Pamela Thomas lives in Manhattan and received Home Relief. *See id.* at App. E, Thomas Aff. ¶ 1.[4] Norma Cintron, her minor son, her adult daughter, and her grandchild received AFDC and Food Stamps

benefits. *See id.* at App. F, Cintron Aff. ¶¶ 1–5.[5] All four named Plaintiffs requested a hearing after learning of City agency action affecting their benefits, were designated to receive aid continuing benefits, but did not receive those benefits within the mandated time frame. In addition, Plaintiffs provided examples of other potential class members, including Jeannette Bello,[6] the children of Martha Diaz,[7] Delilah Mercado,[8] Barbara

**2.** Juana Morel received a notice from the City agency dated May 24, 1994, with an effective date of June 3, 1994. *See* Order to Show Cause of June 16, 1994, at App. C, Morel Statement ¶ 8 & Ex. B. On June 1, 1994, her advocate requested a fair hearing. *See id.* ¶ 11 & Ex. C. On June 6, 1994, she received notice that State agency had directed aid continuing. *See id.* ¶¶ 11–12 & Ex. D. Nevertheless, her benefits were discontinued on June 10, 1994, and not restored until June 17, 1994. *See* Blaustein Aff. ¶ 69. Therefore, Ms. Morel was denied benefits despite filing a timely request.

**3.** On May 7, 1994, Ms. Simmons received a notice of discontinuance effective May 5, 1994. *See* Order to Show Cause of June 16, 1994, at App. D, Simmons Aff. ¶ 5 & Ex. A. On May 9, 1994 she requested a fair hearing by mail. *See id.* ¶ 6. On June 2, 1994 she went to the office of the State agency, where an employee filed an aid continuing directive. *See id.* ¶ 6 & Ex. B. On June 7 or 8, 1994, Ms. Simmons received notice that aid continuing had been directed. *See id.* ¶¶ 7–8 & Ex. C. City agency provided her with aid continuing on June 16, 1994. *See* Blaustein Aff. ¶ 70 & Ex. 9. Ms. Simmons therefore lacked benefits for nearly six weeks despite requesting a hearing after three days and filing a second request three weeks later.

**4.** On April 4, 1994, Pamela Thomas received notice of the City's intent to reduce her benefits. *See* Order to Show Cause of June 16, 1994, at App. E, Thomas Aff. ¶ 2 & Ex. A. On April 14, her advocate requested a fair hearing. *See id.* ¶ 7. State agency directed aid continuing on April 21, 1994. *See id.* ¶ 9 & Ex. C. Nevertheless, on May 2, 1994, Ms. Thomas's Home Relief benefits were reduced. She attended a hearing on May 25, 1994, and her benefits were eventually restored on June 16, 1994. *See* Blaustein Aff. ¶ 71. Therefore Ms. Thomas's benefits were reduced for more than six weeks, despite the State agency's directing aid continuing more that a week before the reduction.

**5.** In late March 1994, Norma Cintron received a notice advising her that her food stamps would be reduced in May. *See* Order to Show Cause of

June 16, 1994, at App. F, Cintron Aff. ¶ 6 & Ex. A. On April 13, 1994, her advocate requested a fair hearing, and the State agency ordered aid continuing. *See id.* ¶¶ 8–9 & Ex. B. Nevertheless, her food stamps were reduced. City agency denied receipt of the aid continuing directive for Ms. Cintron. *See* Blaustein Aff. ¶ 72.

**6.** Jeannette Bello requested a hearing on July 22, 1994 after discovering that her welfare benefits had already been discontinued. She received notice of aid to continue from the State on September 20, 1994. *See* Copelman Decl., Oct. 28, 1994, Ex. A., Bello Aff. ¶¶ 5–6 & Bello Ex. A. She attended a hearing on October 5, 1994, and received a decision in her favor on October 14, 1994. *See id.* ¶¶ 9–10. Her benefits were restored between October 21 and November 16, 1994.

**7.** On July 22, 1994 Martha Diaz requested a hearing to challenge the discontinuance of her children's benefits. She received notice of aid continuing on August 10, 1994. *See* Copelman Decl., Oct. 28, 1994, Ex. C, Diaz Aff. ¶¶ 1–3 & Diaz Ex. A. In early September portions of their benefits were restored. *See id.* ¶¶ 6–7. Despite letters from her advocate and a favorable hearing decision, Ms. Diaz continued to experience problems receiving benefits through November 10, 1994.

**8.** On June 10, 1994, Delilah Mercado requested a fair hearing challenging the discontinuance of her benefits. On June 16, 1994, she received notice of aid continuing. *See* Copelman Decl., Oct. 28, 1994, Ex. E, Mercado Aff. ¶¶ 2–4, & Mercado Ex. A. On June 24, 1994, Ms. Mercado went to the State agency office where an employee filed an aid continuing directive. On July 6, 1994, Ms. Mercado attended a hearing. On July 14, she received a favorable decision. *See id.* ¶¶ 5–14. Not until August 9, 1994 were her benefits restored—more than seven weeks after receiving notice of aid continuing from the State agency. *See id.* at Mercado Ex. C. In late August her benefits were again discontinued. She requested a hearing on September 2, 1994, which was held on September 28, 1994. *See id.* at Mercado Ex. D. Despite a favorable decision on October 4, 1994, she continued to experience problems receiving benefits through November 16, 1994.

Muldrow,[9] Deborah Hinds,[10] Chavis Bullock,[11] Mark Sigle,[12] Erika "Eddy" Jimenez,[13] Dorothy O'Neil,[14] Paulette Williams,[15] Ruth Parker,[16] Dennis Hanlon,[17] and Barbara Music.[18] The experiences of these persons further illustrate the common questions within the proposed class.

## C. Proceedings to date

Plaintiffs moved by Order to Show Cause in front of Judge Sweet, the Part One judge, on June 16, 1994. *See* Order to Show Cause of June 16, 1994. Judge Sweet instructed parties to arrange an expedited discovery schedule among themselves. At that time, City Defendants stipulated to provide temporary relief to named Plaintiffs to the extent of providing them with benefits to which they were entitled pending resolution of the preliminary injunction hearing, which was originally scheduled in July. Parties thereafter stipulated to adjournments, with City Defendants either agreeing or being directed by the Court to forestall any changes in staff pending resolution of the current motions.[19]

The Court has received from parties memoranda citing attached or otherwise submitted State and City agency records, in-

9. Barbara Muldrow requested a fair hearing on September 1, 1994, and received a notice indicating aid to continue dated September 10, 1994. *See* Copelman Decl., Oct. 28, 1994, Ex. F, Muldrow Aff. ¶¶ 7–10 & Muldrow Ex. A. By the hearing on September 28, 1994, Ms. Muldrow had not received benefits. On October 3, 1994 she received a favorable decision. *See id.* ¶ 13. Nevertheless, by October 24, 1994 her food stamps still had not been restored, more than six weeks after the notice of aid continuing, and three weeks after a favorable hearing decision.

10. Deborah Hinds allegedly received a notice in May 1994 that her food stamps would be reduced, requested a hearing and received an aid continuing directive, but the food stamps were nevertheless reduced. *See* Copelman Decl., Oct. 28, 1994, ¶¶ 26–28. Her benefits were allegedly restored for a short time, then reduced again, and not restored until September 15, 1994.

11. Chavis Bullock requested a hearing on July 11, 1994. On July 14 the State agency directed aid to continue. Nevertheless, his benefits were discontinued on July 26, 1994, and were not restored until August 18, 1994, and then only with the assistance of counsel. *See id.* ¶ 30 & Ex. H at 1.

12. Mark Sigle requested a fair hearing on July 6, and again on July 12, 1994. *See id.* ¶¶ 31–33 & Ex. H at 2. Mr. Sigle's benefits were not restored until August 3, 1994.

13. Eddy Jimenez requested a hearing on July 5, 1994, and received a notice of aid continuing on July 12, 1994. *See id.* ¶¶ 34–36 & Ex. H at 3. Nevertheless, her benefits were reduced on July 14, 1994 and not restored until several weeks after a favorable decision from an August 17, 1994 hearing.

14. Dorothy O'Neil's benefits were discontinued in late May, and despite an aid to continue notice, they were not restored until July 11, 1994. *See id.* ¶¶ 37–38 & Ex. H at 4.

15. Paulette Williams's benefits were discontinued in April of 1994, and were not restored until mid July of 1994, despite an aid to continue notice. *See id.* ¶ 39 & Ex. I.

16. Ruth Parker received benefits for her infant granddaughter, Imani Louden. She received a notice of aid continuing dated October 1, 1994. As of December 21, 1994, she allegedly continued to experience problems receiving benefits. *See id.* ¶¶ 40–41; Letter of Marti Copleman, Dec. 21, 1994.

17. Dennis Hanlon received notice of aid continuing on June 29, 1994. His benefits had been discontinued on May 1, 1994 and were not restored until July 15, 1994. *See id.* ¶¶ 42–45.

18. Barbara Music requested a hearing on July 27, 1994. Still, her benefits were discontinued through August 11, when a portion of the funds was restored. *See id.* ¶¶ 46–49 & Ex. I.

19. In addition to this action, Plaintiffs have commenced proceedings in the Eastern District of New York, *see Brown v. Giuliani*, 158 F.R.D. 251 (E.D.N.Y.1994) (Sifton, J.), and in New York Supreme Court. *See Patterson v. Giuliani*, 94/403658, N.Y.Sup.Ct., 1st Dept. (Gammerman, J.).

*Brown* is an action charging that Defendants do not timely process new applications and requests for emergency grants, and do not provide timely benefits to approved applicants. Plaintiffs sought an injunction against the redeployment of supervisors in the Undercare units of City agency. On October 27, 1994, Judge Sifton issued a preliminary injunction enjoining the redeployment of Undercare supervisors pending submission and approval of a plan guaranteeing provision of the rights at issue. *See Brown*, Prelim.Inj.Order & Mem.Decision & Order, (E.D.N.Y., Oct. 27, 1994). Judge Sifton also appointed a Special Master to assist the parties to develop the plan. *See Brown*, Order Appointing Special Master, Nov. 22, 1994.

*Patterson* involves defendants' alleged failure to provide conferences with applicants and recipients when timely requested. Plaintiffs seek an injunction against the redeployment of supervisors currently assigned to the Liaison and Adjustment ("L & A") units of City agency.

terrogatory responses, depositions and public reports. Argument was heard on the motions on November 16, 1994, after which the Court ordered additional submissions consisting of updated State and City agency reports and affidavits explaining various designations therein. The Court also extended the order forestalling redeployment pending the issuance of a decision.

### D. Current aid continuing procedures and staffing

A recipient receives notice of a change in benefits by mail or upon actual reduction or discontinuance of credited funds. Upon notice, a recipient must timely communicate a request for an administrative hearing to the State agency. A request is timely if it is filed before the effective date of a notice of impending change, within ten days of the date a notice is mailed to the recipient, or if no notice was sent, when the request is made. Requests may be communicated by mail, phone, facsimile, or in person at agency offices.

Upon receipt of a timely request, State agency determines whether the recipient is entitled to aid continuing. See Blaustein Aff. ¶¶ 11–19; Blaustein Dep. at 160. State agency then issues either a "Fair Hearing Request" notice to City agency indicating if aid is to continue, or an "Aid Continuing Directive" either instructing City agency not to change the recipient's benefits until after a hearing, or ordering restoration of benefits if they have already been changed. State agency also inputs each request into a computerized Fair Hearing Information System. See Carberry Dep. at 35. In cases involving discontinuances and recoupments, expeditious processing can avert some changes in benefits. In cases involving reductions or restrictions, State agency cannot avert the

action automatically. Once the change in benefits has been effected, State agency is unable to effect restoration by itself. See id. at 35–37, 47–50.

All notices are sent to the State agency office in New York City. Each day a City agency messenger retrieves the notices and brings them to City agency's Fair Hearing Control Unit (herein "FHCU"), from which they are sorted for distribution to one of thirty-nine Income Support Centers ("ISCs") citywide. See Carberry Dep. at 37–41. ISCs currently consist of at least six units: Reception, Administration, Applications, Liaison & Adjustment ("L & A"), Undercare, and Control. See Blaustein Aff. at 4–12.

The L & A unit of each ISC receives the notice and attempts to prevent or to reverse the challenged change in benefits. To reverse a change, supervisors in the L & A units relay the notices to a designated group within the Undercare units. An Undercare group consists of one supervisor, five "eligibility specialists" (the "specialists"), and one half-time clerk. The Undercare group supervisor relays the notice to the specialist for that case. The specialist processes the notice, then returns all the forms to the supervisor, who reviews them and passes them on to the clerk. From the clerk, the forms go to the ISC Control unit for input, upon which the change is reversed. See Blaustein Aff. ¶¶ 9–10, 20–41.

Under these procedures, the three positions most directly responsible for processing aid continuing are the L & A supervisors, the Undercare supervisors, and the Undercare eligibility specialists, the latter being most responsible for the timely processing. At current staffing levels there are approximately 108 L & A supervisors,[20] 436 Undercare supervisors,[21] and approximately 2,393 Undercare eligibility specialists in the thirty-

---

**20.** See id. ¶ 38. L & A supervisors set schedules, conduct conferences to review decisions of Undercare units which affect assistance levels, review documentation, review case records, process aid continuing to recipients (pending hearings) and implement fair hearing decisions. They also serve as "Service Representatives" on rotation—liaisons between the ISC and recipients or applicants with complaints. See Blaustein Aff. ¶¶ 32–37.

**21.** See id. ¶ 24. Undercare supervisors are supposed to oversee one group of five eligibility specialists (1:5 supervision span). Supervisors are supposed to set schedules, assign work, review and authorize actions of eligibility specialists, and evaluate and train staff. Supervisors are also responsible for handling unassigned cases and backlogs when they develop. See Blaustein Aff. ¶¶ 22–24.

nine ISCs.[22] Defendants claim that the average Undercare specialist currently has a monthly workload of 200 cases, with some specialists having up to 300 cases. *See* Blaustein Dep. at 255–66. Defendants admit, however, that this average does not include upwards of 20,000 cases not assigned to any specialist. *See id.* at 192–97; Cohan Decl. ¶ 68. Plaintiffs assert, therefore, that the 1994 average caseload is at least 237 cases per specialist. *See* Cohan Decl. ¶ 67.

In addition to L & A and Undercare supervisors and specialists, there are L & A and Undercare clerks and Control unit staff who process aid continuing paperwork for the L & A and Undercare units. There are currently approximately 33 L & A and 195 Undercare clerks, and 33 supervisors, 70 assistant supervisors, 209 clerks, and 133 data entry clerks in the Control units of the thirty-nine ISCs. *See* Blaustein Aff. ¶¶ 39–41.

### E. The proposed redeployment ("the Plan") & workloads

Plaintiffs seek an order enjoining the proposed redeployment of staff within City agency to the extent that it would affect staffing responsible for aid continuing. City Defendants, on the other hand, contend that the redeployment will eliminate inefficiencies in the current procedures and allow for improved processing of aid continuing.

Under the Plan the ISC Applications and Undercare units will be merged. *See* Blaustein Aff. ¶ 52. Where currently the Applications units handle all new cases, under the Plan the new Applications units will handle only emergency cases and primary intake. New, non-emergency cases will be handled by the Undercare specialists at a proposed rate of two to three per week, in addition to their normal caseloads. *See id.* ¶ 54. Undercare specialists will also be responsible for thirty-six case recertifications per month. *See* Blaustein Dep. at 334.

The L & A units will gain thirty-six supervisors over current levels. City agency alleges that because these supervisors hold a higher civil service title, they will be able to pre-approve some requests for hearings, thereby reducing the need for Undercare supervisors to review some specialist actions. *See* Blaustein Aff. ¶¶ 48–50. Plaintiffs contend that the L & A units are already understaffed and that this increase constitutes only a partial restoration of earlier reductions.

Undercare supervisors will be reduced by 135 and the size of Undercare groups will double, from five to ten specialists per supervisor. *See* Blaustein Aff. ¶ 60. One specialist in each group will assume a new title, group supervisor assistant, and will assist the supervisor while maintaining a full load of 175 cases, thirty-six recertifications per month, and two new applications each week. *See id.* ¶¶ 56–58. The Undercare units will also get thirty-five new clerks. *See id.* ¶¶ 47 & 59.

Finally, the Plan will implement "selective review" of specialist actions. Where currently all specialist actions are reviewed, under the Plan Undercare supervisors would no longer review decisions that do not change a case budget. *See* Blaustein Aff. ¶¶ 63–65. Decisions not to implement aid continuing, for example, will not be reviewed.

### *Discussion*

As an initial matter, this action states a judicially resolvable case or controversy within the meaning of Article III of the United States Constitution. The controversy is whether Defendants are complying with federal and state constitutional, statutory and regulatory standards in providing Plaintiffs and the proposed class with timely aid continuing benefits. As such, it is clearly justiciable. *See Goldberg*, 397 U.S. 254, 90 S.Ct. 1011; *Rosado v. Wyman*, 397 U.S. 397, 402–07, 90 S.Ct. 1207, 1212–15, 25 L.Ed.2d 442 (1970); *Brown v. Giuliani*, 158 F.R.D. 251 (E.D.N.Y.1994). Moreover, this Court has the authority to grant the injunctive relief Plaintiffs seek on this motion. *See Dandridge v. Williams*, 397 U.S. 471, 487, 90 S.Ct. 1153, 1162–63, 25 L.Ed.2d 491 (1970)

---

**22.** *See id.* ¶ 26. Undercare eligibility specialists manage cases of recipients by determining eligibility and the amount of benefits, implementing aid continuing, determining special and emergency grants, meeting with recipients on request, and preparing authorization forms. *See id.* ¶ 25. They do not handle new applications, either emergency or non-emergency.

(Constitution imposes procedural safeguards on welfare administration); *Goldberg,* 397 U.S. at 261–66, 90 S.Ct. at 1016–20; *see also Brown,* 158 F.R.D. at 267; *Class v. Norton,* 376 F.Supp. 496, 500–03 (D.Conn.1974), *aff'd in part, rev'd in part,* 505 F.2d 123 (2d Cir.1974); *New York State Ass'n for Retarded Children, Inc. v. Rockefeller,* 357 F.Supp. 752, 768 (E.D.N.Y.1973). This relief does not invade the decision-making provinces of State and City executive and legislative officials, but would require City Defendants to resolve their fiscal difficulties in a fashion that complies with the Constitution and the law. *See, e.g., Dunn v. New York State Dep't of Labor,* 474 F.Supp. 269, 274–76 (S.D.N.Y. 1979).

■ Defendants seem to assert the political question doctrine, urging the Court to deny relief because Defendants are executive entities. That doctrine, however, is inapplicable between a federal court and a State or City entity. *See Baker v. Carr,* 369 U.S. 186, 82 S.Ct. 691, 7 L.Ed.2d 663 (1962).

■ Defendants also urge the Court to defer on principles of federalism and state sovereignty. While respecting those principles, the Court notes that such discretion goes to the fashioning of any relief, not the determination of justiciability.

• ■ Defendants explicitly claim that Plaintiffs lack standing. Standing doctrine addresses a party's interest in the outcome of a controversy and generally requires a showing of individuated injury, causation, and redressability. *See Duke Power Co. v. Carolina Envtl. Study Group, Inc.,* 438 U.S. 59, 72–81, 98 S.Ct. 2620, 2629–35, 57 L.Ed.2d 595 (1978). Plaintiffs have satisfied this standard by showing that they were denied aid continuing benefits and thereafter requested relief clearly designed to remedy that denial.

■ Finally, Defendants claim that Plaintiffs' claims are moot because the named Plaintiffs have received either aid continuing benefits or a notice of decision following a hearing. *See* State Resp.Mem. at 5; City Resp.Mem. at 7. An issue will not be

treated as moot, however, if it is "capable of repetition, yet evading review." *See Southern Pacific Terminal Co. v. Interstate Commerce Comm'n,* 219 U.S. 498, 515, 31 S.Ct. 279, 283, 55 L.Ed. 310 (1911). As recipients of public benefits, Plaintiffs are still subject to harm from future attempts by Defendants to change their benefits without a hearing. Moreover, an action is not moot where, as here, the voluntary cessation of the conduct complained of occurred after filing and the party can be reasonably expected to repeat the offensive conduct in the future. *See De Funis v. Odegaard,* 416 U.S. 312, 317–18, 94 S.Ct. 1704, 1706–07, 40 L.Ed.2d 164 (1974). Finally, mootness is generally unwarranted in class actions where at least one member of the class has a live claim. *See Franks v. Bowman Transp. Co.,* 424 U.S. 747, 752–57, 96 S.Ct. 1251, 1258–61, 47 L.Ed.2d 444 (1976); *Robidoux v. Celani,* 987 F.2d 931, 939 (2d Cir.1993). For the above reasons, the Court finds that Plaintiffs have presented a justiciable claim.

**A. Plaintiffs' motion for class certification**

Plaintiffs request from the Court an order certifying the following class:

> All residents of New York City who have received, receive, or will receive AFDC, Food Stamp or Home Relief benefits who have requested, are requesting, or will request a fair hearing in response to an action by the City agency to discontinue, suspend, reduce or restrict benefits and are entitled to aid continuing.

*See* Pls.' Mem. at 37. Rule 23 contains a two-tier test for class certification. Plaintiffs must first meet Rule 23(a)'s four requirements for defining a class: a class so numerous that joinder is impracticable; questions of law or fact common to the class; named parties with interests typical of the class; and class representatives who will provide fair and adequate representation of absent members of the class. *See* Fed.R.Civ.Proc. 23(a). Plaintiffs must then demonstrate that the case falls within one of Rule 23(b)'s three categories where class action is appropriate.[23]

---

**23.** Rule 23(b) permits an action to proceed as a class where the prerequisites of subdivision (a) are satisfied and (1) the prosecution of separate actions would create a risk of inconsistent adju-

■ Plaintiffs' proposed class satisfies the requirements of Rule 23(a). There are approximately 24,000 potential class members, thus satisfying the numerousity requirement of Rule 23(a)(1).[24] The matter turns on common questions of law concerning the duty of Defendants to provide timely aid continuing, and the relief available for breach of that duty. The only questions of fact relevant to the Court's determination are also common to all class members: (a) Was each individual plaintiff determined by State Defendant to be eligible for aid continuing? and (b) Did that person timely receive that aid continuing? Other factual considerations are irrelevant.

■ Plaintiffs meet the typicality requirement because their claims arise from the same conduct as those of the proposed members of the class, their claims are premised on the same legal bases, and their interests are not adverse to the interests of other class members. *See General Telephone Co. of Southwest v. Falcon,* 457 U.S. 147, 157 n. 13, 102 S.Ct. 2364, 2370–71 n. 13, 72 L.Ed.2d 740 (1982); *Copeland v. Perales,* 141 F.R.D. 11, 16 (E.D.N.Y.1992); *Lewis v. Gross,* 663 F.Supp. 1164, 1168 (E.D.N.Y.1986); *Krome v. Merrill Lynch & Co.,* 637 F.Supp. 910, 921, *vacated, in part, on other grounds,* 110 F.R.D. 693 (S.D.N.Y.1986). Minor factual differences in the circumstances of each class representative and the class members are not determinative, so long as they share the ultimate issues of entitlement to and denial of timely aid continuing. *See White v. Mathews,* 559 F.2d 852, 858 (2d Cir.1977), *cert. denied,* 435 U.S. 908, 98 S.Ct. 1458, 55 L.Ed.2d 500 (1978).

■ Finally, the proposed class representatives bear the burden of proving that they are capable of fairly and adequately protecting the interests of the proposed class. *See Feinstein v. Firestone Tire and Rubber Co.,* 535 F.Supp. 595, 600 (S.D.N.Y. 1982). Because absent class members will be bound by the results obtained by the class representatives and their attorneys, due process requires the Court to scrutinize the adequacy of purported class representatives. *See In re Boardwalk Marketplace Secs. Litig.,* 122 F.R.D. 4, 7–8 (D.Conn.1988). "The adequate-representation requirement is satisfied by a commonality of interests between representatives and class members and vigorous prosecution by plaintiff[s] and plaintiffs' counsel." *Akerman v. Oryx Communications, Inc.,* 609 F.Supp. 363, 378 (S.D.N.Y. 1984), *aff'd in part, dismissed in part, & remanded,* 810 F.2d 336 (2d Cir.1987). The named Plaintiffs and intervenors are adequate representatives of the proposed class, and their counsel are skilled advocates with experience representing similarly positioned persons. The Court recognizes the adequacy of these representatives.

■ City Defendants claim that the proposed class is not precisely drawn and would therefore require the Court to examine the individual circumstances of each claimant. *See* City Resp.Mem. at 12–13. The Court notes that every proposed class requires a determination as to an individual's membership, and that that determination does not defeat the identification of the class itself. Plaintiffs have restricted their class to persons who "are entitled to aid continuing," and have not challenged any aspect of the determination of entitlement which is currently performed by the State agency. *See* Pls.' Reply Mem. at 34–35. The Court, therefore, will not be required to evaluate the individual merits of each recipient's request for benefits.

---

dications, establish inconsistent standards of conduct, or would prejudice the interests of others; (2) the party opposing the class has acted or refused to act on grounds generally applicable to the class, thereby making appropriate final injunctive relief or corresponding declaratory relief with respect to the class as a whole; or (3) the court finds that the questions of law or fact common to the members of the class predominate and that a class action is superior to other available methods for the fair and efficient adjudication of the controversy.

**24.** *See* Pls.' Mem. at 38. Approximately 60,000 New York City residents apply for hearings each year, of which approximately 40% or 24,000 are determined eligible for aid continuing. As discussed below, City Defendants fail to implement aid continuing in at least 10% of all cases. Therefore the class as defined would include from 2,400 up to 24,000 members at any time.

Moreover, class actions such as the proposed class have been shown to be an appropriate method of obtaining relief in benefits cases. *See, e.g., Brown,* 158 F.R.D. at 268; *Haskins v. Stanton,* 794 F.2d 1273, 1275 (7th Cir.1986) (food stamps); *Barnett v. Bowen,* 794 F.2d 17, 22 (2d Cir.1986) (disability benefits). This is true even where the proposed class definition includes a prospective membership. *See Robidoux,* 987 F.2d at 939; *Henry v. Gross,* 803 F.2d 757, 763 (2d Cir. 1986); *Percey v. Blum,* 524 F.Supp. 324, 327 (N.D.N.Y.1981); *Luyando v. Bowen,* 124 F.R.D. 52, 57 (S.D.N.Y.1989), *rev'd on other grounds,* 8 F.3d 948 (1993). The Court therefore finds that Plaintiffs have satisfied the requirements of Rule 23(a).

▮▮▮ Plaintiffs seek certification of the class under Rule 23(b)(2) & (3). The Court agrees that Plaintiffs' action properly falls within the scope of these provisions. Plaintiffs seek declaratory and injunctive relief against Defendants acting or refusing to act on grounds generally applicable to the class members. *See* Fed.R.Civ.Proc. 23(b)(2). That is, Plaintiffs seek relief against Defendants' failure to act timely when aid continuing is warranted. Moreover, Plaintiffs seek injunctive relief against Defendants proposed conduct in redeploying persons responsible for the timely provision of aid continuing. *See id.* This type of injunctive relief is clearly more appropriate in the class action setting than in an individual action. Finally, Plaintiffs note that the relief sought includes a demand for ongoing, class-wide monitoring of Defendants' compliance with aid continuing requirements. *See* Fed.R.Civ.Proc. 23(b)(3). This type of ongoing monitoring is most appropriate in the class setting.

▮▮▮ Defendants claim that a class action is unnecessary because any relief accorded the named Plaintiffs would be incorporated by State and City agencies into uniform regulations. This assertion, however, neglects the historical reluctance of City agency to provide class-wide relief in similar cases. *See RAM v. Blum,* 533 F.Supp. 933, 939 (S.D.N.Y.1982); *Swift v. Blum,* 502 F.Supp. 1140, 1143–44 (S.D.N.Y.1980); *Montes v. Brezenoff,* 85 F.R.D. 130, 132 (S.D.N.Y.1980). Defendants also assert that

*stare decisis* would protect subsequent Plaintiffs, and therefore that a class action is not a preferred method of adjudication under Rule 23(b)(3). This claim overstates the protection afforded to Plaintiffs by that doctrine, particularly to indigent plaintiffs. *See Jane B. v. New York City Dept. of Social Services,* 117 F.R.D. 64, 72 (S.D.N.Y. 1987); *Koster v. Perales,* 108 F.R.D. 46, 54 (E.D.N.Y.1985); *Bizjak v. Blum,* 490 F.Supp. 1297, 1301 (N.D.N.Y.1980). Moreover, it ignores the many cases allowing class actions to seek injunctive relief against government agencies. *See, e.g., Robidoux,* 987 F.2d at 937; *Barnett,* 794 F.2d at 22; *Cutler v. Perales,* 128 F.R.D. 39, 45–47 (S.D.N.Y.1989).

For the foregoing reasons, the Court finds that Plaintiffs have satisfied the burdens of Rule 23 and grants the motion for certification of the class proposed above.

### B. Plaintiffs' motion for a preliminary injunction

▮▮▮ In this Circuit, the party seeking a preliminary injunction has the burden of showing " '(a) irreparable harm and (b) either (1) likelihood of success on the merits or (2) sufficiently serious questions going to the merits to make them a fair ground for litigation and a balance of hardships tipping decidedly toward the party requesting preliminary relief.' " *See Citibank, N.A. v. Citytrust,* 756 F.2d 273, 275 (2d Cir.1985) (quoting *Bell & Howell: Mamiya Co. v. Masel Supply Co. Corp.,* 719 F.2d 42, 45 (quoting *Jackson Dairy, Inc. v. H.P. Hood & Sons, Inc.,* 596 F.2d 70, 72 (2d Cir.1979))). "Where, as here, a preliminary injunction 'seeks to stay governmental action taken in the public interest pursuant to a statutory or regulatory scheme,' the less rigorous fair-ground-for-litigation standard should not be applied." *Sweeney v. Bane,* 996 F.2d 1384, 1388 (2d Cir.1993) (quoting *Plaza Health Labs., Inc. v. Perales,* 878 F.2d 577, 580 (2d Cir.1989)). Where the preliminary relief sought is the same as the ultimate relief, the standard is heightened to substantial likelihood of success. *See Abdul Wali v. Coughlin,* 754 F.2d 1015, 1025–26 (2d Cir.1985). Plaintiffs' present request for an injunction, however, dif-

fers from Plaintiffs' ultimate pleas for a plan to guarantee provision of aid continuing, for on-going monitoring, and for periodic reports on compliance. *See* Pls.' Mem. at 25–26; Pls.' Reply Mem. at 3. The heightened standard is therefore unwarranted.

### 1. Immediate & irreparable harm

 The protracted denial of aid continuing benefits constitutes immediate and irreparable harm. To indigent persons, the loss of even a portion of subsistence benefits constitutes irreparable injury. *See, e.g., Hurley v. Toia,* 432 F.Supp. 1170, 1176–78 (S.D.N.Y.), *aff'd* 573 F.2d 1291 (2d Cir.1977); *Lyons v. Weinberger,* 376 F.Supp. 248, 262–63 (S.D.N.Y.1974); *Boddie v. Wyman,* 323 F.Supp. 1189, 1193 (N.D.N.Y.), *aff'd,* 434 F.2d 1207 (2d Cir.1970), *aff'd* 402 U.S. 991, 91 S.Ct. 2168, 29 L.Ed.2d 157 (1971). Courts have provided preliminary relief in cases alleging imminent deprivation of such benefits under federal programs. *See Willis v. Lascaris,* 499 F.Supp. 749, 759–60 (N.D.N.Y. 1980); *Bennett v. Butz,* 386 F.Supp. 1059, 1062 (D.Minn.1974); *Moreno v. United States Dept. of Agriculture,* 345 F.Supp. 310, 310–12 (D.D.C.1972), *aff'd* 413 U.S. 528, 93 S.Ct. 2821, 37 L.Ed.2d 782 (1973).

The members of the plaintiff class suffer deprivation of their subsistence benefits. In addition, the submissions demonstrate that once these benefits have been changed, they are often not timely restored despite direction from State agency to City Defendants. State and City agency records show that between June 1, 1994 and October 31, 1994 an average of forty-four days elapsed between a request for a hearing and the issuing of a hearing decision in aid-continuing AFDC, Home Relief, and Food Stamps cases from New York City. *See* Blum Supplemental Reply Decl. Ex. A (NYS–DSS, Bureau of Fair Hearings, Office Workload Reports, Item 9); Lacivita Aff.Exs. 1 (same), & 3 (explanatory memorandum). While the records do not indicate the degree to which aid continuing benefits are provided during this time period, the figures demonstrate that if benefits are denied prior to a hearing the deprivation may last weeks or months.

The degree of harm resulting from this delay is made evident by the fact that most changes in benefits are reversed or withdrawn after a hearing. *See* Blum Supplemental Reply Decl. Ex. B (NYC Workload Reports, Items 4B & 4C) (indicating average of 49% reversals and 41% withdrawals each month from June 1, 1994 through October 31, 1994). Moreover, City agency apparently experiences problems complying with approximately 11% of the hearing decisions in aid continuing cases. *See id.* (Items 5 & 6) (average number of compliance complaints in relation to the number of decisions issued each month from June 1, 1994 through October 31, 1994). Plaintiffs, therefore, have shown irreparable harm.

Plaintiffs allege that the proposed redeployment plan will exacerbate Defendants' current difficulties in timely providing aid continuing. Without here addressing the merits of that claim, the Court recognizes that reversing the redeployment would be factually difficult, if not impossible. *See* Cohan Decl.Ex. Y, Tr. of City Council Test. of Commissioner Hammons, May 24, 1994, at 45 (City agency is currently above headcount and unable to hire additional staff.); Blaustein Dep. at 386 ("[T]here will be no increase in head count … [i]n this fiscal year or the immediate future."); *id.* at 389 (Prior requests to increase in head count to accommodate targeted caseloads were denied.). To that extent, if the redeployment fails to produce compliance with aid continuing mandates, its effect would be irreparable.

For the reasons stated, the Court finds that Plaintiffs have adequately demonstrated immediate and irreparable harm.

### 2. Success on the merits

 In order to demonstrate a likelihood of success on the merits Plaintiffs must first show that Defendants currently fail to provide aid continuing benefits. In order to warrant the injunctive relief sought, Plaintiffs must then demonstrate that the proposed redeployment plan will not correct such failure. Plaintiffs have satisfied these showings.

### a. Defendants fail to provide timely aid continuing.

The experiences of the named Plaintiffs and other class members discussed above suggest a pattern of failure in providing timely benefits. *See supra* at 627–629. Various community advocates recounted similar experiences. *See* Cohan Decl.Ex. B. at Evans Aff.; *id.* at Krueger Aff.; *id.* at Rosenfeld Aff.; *id.* at Harding Aff. More important, however, are the records and statements of State and City agencies that indicate an awareness of problems meeting aid continuing mandates.

State Defendant has acknowledged that it cannot yet guarantee timely provision of aid continuing to anyone requesting a hearing by mail. *See* Lacivita Dep. at 117–18, 141–43. This in light of recent figures which indicate that at least a third of the requests for fair hearings emanating from New York City are received by mail. *See* Blum Supplemental Reply Decl. Ex. B (NYS–DSS, Bureau of Fair Hearings, Office Workload Reports, Items 1A & 8); Lacivita Aff. Exs. 1 (same), & 3 (explanatory memorandum) (34% of all new requests emanating from New York City were received by mail from June 1, 1994 through October 31, 1994). State Defendant acknowledged that it often took three to four weeks, sometimes more, for the information contained in a fair hearing form to be entered into the State computer, amounting to delays ranging from 4,500 to 7,500 requests. *See* Lacivita Dep. at 118. State Defendant attributed this backlog to a shortage of staff. *See* Lacivita at 120.

State Defendant also acknowledged that State agency is "unable to provide enough staff to answer the phones to do the job in a way that provides adequate service, and that the only way to improve that at this point in time is with more staff." *See* Lacivita Dep. at 212. At least one fourth of all new requests from New York City are received by phone. *See* Blum Supplemental Reply Decl. Ex. B (NYS–DSS, Bureau of Fair Hearings, Office Workload Reports, Items 1A & 8); Lacivita Aff. Exs. 1 (same), & 3 (explanatory memorandum) (25% of all new requests emanating from New York City were received by mail from June 1, 1994 through October 31, 1994).

The Court notes that State agency has attempted to address staff shortages by use of overtime and improved information systems. *See* Cohan Decl. Ex. E, NYS–DSS Quarterly Overtime Plan, Oct. 5, 1993; Lacivita Aff. (Aug. 16, 1994); Tr. at 39 (Nov. 16, 1994). While there is evidence of recent improvements, State agency continues to experience regular delays in processing requests. *See* Tr. at 40. These delays contribute to delays in City agency's provision of timely aid continuing benefits.

In addition, State agency fails to supervise City agency's provision of aid continuing benefits, thereby contributing to undiscovered delays. *See* Carberry Dep. at 71 (no monitoring by state, city or federal government with respect to timely provision of aid to continue); Blaustein Dep. at 271, 275, 279, 281–83 (no audits, records or monitoring of time it takes to comply with aid continuing directives).

For their part, City Defendants admit to failing to provide services within mandated time frames in at least 10% of all cases. *See* Blaustein at 391–92. However City Defendants provide no records or monitoring methods to assure the Court that this failure rate is not significantly higher.

There are apparently no records of the total number of cases in which initial aid continuing directives are issued each month. Agency records for the period June 1, 1994 through October 31, 1994, however, indicate that approximately 3100 initial hearings are scheduled each month in aid continuing AFDC, Food Stamps, and Home Relief cases from New York City. *See* Blum Supplemental Reply Decl. Ex. B (NYS–DSS, Bureau of Fair Hearings, Office Workload Reports, Item 1A); Lacivita Aff.Exs. 2 (same), & 3 (explanatory memorandum). Alternatively, there are approximately 6800 new requests for hearings each month in AFDC Home Relief and Food Stamps cases, *see* Blum Supplemental Reply Decl.Ex. B (NYS–DSS, Bureau of Fair Hearings, Office Workload Reports, June–Sept. 1994, Item 1A); Lacivita Aff.Exs. 2 (Oct.1994), & 3 (explanatory memorandum), of which approximately 40% or

more than 2700 are likely to be determined eligible for aid continuing.

In approximately 320 cases per month "redirect" orders or "multiple" redirect orders are issued. *See* Blum Supplemental Reply Decl.Ex. B (NYS–DSS, Bureau of Fair Hearings, Office Workload Reports, Items 8 & 9); Lacivita Aff. Exs. 2 (same), & 3 (explanatory memorandum). Redirect orders are issued after an initial order is not implemented and a subsequent complaint is received. Multiple redirects are any orders issued after the first two upon continued failure to provide aid continuing and continued complaints. *See* Lacivita Dep. at 193–97. This number of redirects and multiples suggests that in at least 10–12% of all cases City agency fails to provide aid continuing benefits upon issuance of an initial aid continuing directive.

Moreover, this estimate does not include cases where only one directive was issued but benefits were not provided within mandated time frames or cases in which indigent claimants failed to file repetitive complaints.[25] Three of the above named Plaintiffs and twelve of the thirteen additionally named class members, for example, would likely not be represented in the 10% figure because they filed only one request for a fair hearing or received only one notice of aid to continue despite not receiving benefits within the mandated time frame. The actual failure rate, therefore, is likely to be higher.

City agency's internal quality reports from varying periods from 1992 through 1994 suggest a link between the failure to provide timely services and insufficient staffing in the Undercare units. *See* Cohan Aff.Ex. L. These reports detail substantial numbers of unassigned caseloads, *see id.* (two unassigned caseloads at Crotona ISC; five at Yorkville; eleven at Melrose; eight at Bergin; eight at Willis; seven at Wyckoff; five at Richmond), unsupervised Undercare groups, *see id.* (three unsupervised groups at Yorkville ISC; two at Bergin; two at Willis; three at Wyckoff; two at Richmond), and overworked Un-

dercare specialists. *See id.* (275–328 cases per specialist at the Amsterdam ISC). These reports support the finding that City agency fails to provide timely aid continuing in significantly more that 10% of all cases designated eligible by State agency, and therefore that Plaintiffs have shown a substantial likelihood of success on the merits.

**b. The redeployment plan as presented does not guarantee improved delivery of aid continuing.**

Plaintiffs have also shown that the redeployment plan, as it was presented by City Defendants, does not guarantee improvements in City agency's provision of aid continuing.

Plaintiffs presented statements indicating the City agency's awareness that current staff shortages contribute to difficulties in meeting legal mandates, and that proposed staff cuts would likely exacerbate the problem. One report, for example, noted that

> [t]he Administration plans to cut AFDC, Home Relief, Food Stamp and Emergency Food programs by 2,248 positions.... This ... reduction ... *has the greatest impact in liaison and adjustment staff, supervision in undercare and new applications,* pre-screening, clerical support, field auditors, fair hearing facilitators, *and eligibility specialists.* The timely and accurate processing of income support applications may be at risk, due to increases in public assistance caseload ... and the cumulative reductions and redeployments throughout Income Support. Timely processing of all entitlement claims ... [is] Federally mandated, and violations may result in sanctions and penalties. Cumulative reductions in fair hearing support staff may expose the City to sanctions.

Cohan Decl.Ex. W, Fiscal 1995 Exec. Budget Hearings, May 24, 1994, Committee on General Welfare, DSS/HRA, at 10 (emphasis added); *see also* Cohan Decl.Ex. BB, HRA Office of Budget Administration, Executive

---

**25.** Other records indicate that approximately 380 Home Relief cases and 58 AFDC cases are opened or reopened each month in response to aid continuing directives after a recipient challenges an agency action closing the case. *See* Smith Aff.Exs. A & B (WMS Report WINRO191,

Sept. & Oct. 1994). However, absent a total number of directives issued each month and similar figures for recoupments, reductions, or changes in method or location of payment it is impossible to determine by these figures the rate of compliance with mandates. *See id.* ¶ 11.

FY1995 P.E.G.'s, May 24, 1994, Resp. Center IS, at 1 ("[The proposed reductions] [m]ight result in increased error rates and delays in eligibility approvals and recertifications which might lead to sanctions."); *see id.* at 4 ("[R]educed supervision will also potentially increase the error rate and limit our ability to meet fair hearing compliance timeframes, recertification timeframes, and other similar mandates."). Defendant Hammons, moreover, has acknowledged that staff reductions would subject City agency not only to sanctions, but to the precise types of claims asserted in this action.

> [C]uts of this dimension will lead to almost immediate State and Federal sanctions for failure to meet legally mandated requirements.... In addition, lawsuits will be filed by advocates ... seeking to restore mandated services and staffing levels. We will not be able to defend these lawsuits.

Cohan Decl.Ex. AA, Memorandum from Hammons to Lackman, Feb. 11, 1994, at 1.

Plaintiffs have also demonstrated meaningful concerns that redeployment will actually worsen the provision of aid continuing benefits. Under the plan the Applications and Undercare units will merge. While not objecting to the merger itself, Plaintiffs have presented evidence that questions the feasibility of the agency's proposed division of responsibilities for processing new applicants as well as for aid continuing. This evidence includes City agency quality control reports from 1992 to 1994 demonstrating insufficient staff to handle applications. *See* Cohan Ex. L. (Roosevelt Drive ISC: "[w]orkers from undercare were constantly pulled to conduct [application] interviews"; Crotona ISC: undercare staff routinely used in Applications; Queensboro ISC: "staff were constantly being pulled from undercare to do paperwork in applications"; Brownsville ISC: Undercare area "adversely affected" by need to assist in Applications; Amsterdam ISC: Undercare supervisors *double covered in Appli*cations hampering ability to meet deadlines). Since City agency has endured a significant headcount reduction and increase in total cases over the last two years, the Court has no reason to assume such problems have abated. The Court therefore must find that the merger of the backlogged Applications units with the Undercare units already found to experience delays in aid continuing is unlikely to result in improved service.

No significant increase in staff accompanies the merger to rebut this finding. The numbers provided to the Court indicate a net decrease of 967 specialists within the City agency, and a net increase of only 88 specialists in the reformulated Applications and Undercare units. *See* Blaustein Aff. ¶¶ 53–58. According to City agency, however, more important than the total number of specialists is the average caseload. The City agency states that the Plan will guarantee timely aid continuing benefits by maintaining a monthly average of 175 cases per specialist. Plaintiffs have successfully shown, however, that City agency's ability to achieve and to maintain this targeted ratio rests on unsupported assumptions.

City agency assumes that the number of total cases will not increase in fiscal year 1995. Yet Plaintiffs have demonstrated that total cases for the City agency have increased steadily for several years, from 476,-023 in May of 1992 to 555,357 in June of 1994. *See* Cohan Decl. ¶ 62 & Ex. O; Blaustein Dep. at 310–11. City Defendants offers no rebuttal to these figures to which the Court could defer. Indeed, a City budget officer acknowledged that the City has no reliable method for predicting caseloads. *See* Anantharam Dep. at 54–59.

Also unsupported is City agency's assertion that specialists will maintain a steady workload by closing as many cases each month as they accept for benefits. Under the plan, a specialist will be responsible for eight to twelve new applications each month, of which approximately 40%, or three to five, would be accepted and added to the specialist's workload. City agency claims that each specialist will also average six to eight closings a month, thereby maintaining a workload averaging 175 cases. *See* Blaustein Dep. at 342. Plaintiffs assert, however, that these figures overlook cases which are closed and re-opened during the same month which are reported as closings but which will remain in a specialist's caseload. *See* Richardson Aff. ¶ 35. When accounting for such

cases, Plaintiffs assert, the Plan fails to maintain the 175 average caseload that City agency indicates is the key to improving the timely provision of aid continuing. City agency failed to rebut this assertion.

City agency also failed to provide anything other than conclusory statements supporting its assertion that selective review procedures and the designation of Undercare supervisor assistants will produce anticipated efficiencies. *See* Blaustein Dep. at 331–38. While the Court respects the agency's province to devise and implement innovations to its policies and procedures, City Defendants simply did not present any substantive basis for its projections to which the Court could reasonably defer.

Ultimately City Defendants presented only one substantive response to Plaintiffs' objections to the redeployment: City agency offered that if monitoring indicates that the average workload begins to rise above 175 cases, the agency would seek additional staff. *See* Blaustein Dep. at 382–85. The Court notes, however, that such staff increases are improbable in the foreseeable future. *See* Blaustein Dep. at 386. Indeed, such requests have been denied previously. *See* Blaustein Dep. at 389. The Court, therefore, in the absence of any other substantive support for City agency's assertions and rebuttal of Plaintiffs' claims, cannot simply defer to what is ultimately the wait and see approach advocated by City Defendants.

The Court finds that Plaintiffs have demonstrated the substantial likelihood that City agency will be unable to provide timely aid continuing after the redeployment. The Court further finds that City Defendants have failed to provide sufficient substantive evidence to overcome this likelihood. Injunctive relief is therefore warranted to prevent a worsening of the harms demonstrated by Plaintiffs.

## C. Injunctive relief

Plaintiffs sought an order requiring Defendants to provide aid continuing to the named Plaintiffs. *See* Pl.Mem. at 24–25. The Court understands that all named Plaintiffs have received or are currently receiving the aid continuing benefits for which they were or are eligible. However, to the extent that such benefits have not already been provided, the Court orders Defendants to ensure their provision within a period not to exceed two calendar weeks from the date of this Opinion.

Plaintiffs sought an order requiring Defendants to provide aid continuing to those unnamed plaintiffs and informal intervenors who have not yet received the benefits to which they are entitled. The Court grants this request and orders Defendants to take every measure to comply with applicable mandates for the timely provision of aid continuing. Such measures should include, but are not limited to, maintaining throughout the duration of this litigation the informal intervenor procedure developed by counsel and reported to the Court on November 17, 1994. *See* Letter of Ian F. Feldman to Ann M. Vroman, Nov. 17, 1994. Amendments or alterations to that procedure henceforth may be made only by stipulation between the parties and on approval of the Court.

Plaintiffs sought an order enjoining City Defendants from further reducing the staff responsible for insuring that all class members receive their aid unchanged pending a fair hearing decision. The Court grants such relief insofar as it orders a temporary continuation of the existing stay of reductions in the L & A and Undercare staff responsible for the provision of aid continuing. This stay may be removed by City Defendants upon Court approval of a report addressing with specificity and substance the methods by which City agency will rectify its failure to provide aid continuing on a timely basis. An appropriate submission should address, along with whatever pertinent information Defendants wish to provide, evidence supporting City agency's assertions that have been questioned herein. This report should therefore include (a) evidence of the total number of initial aid continuing directives issued each month in response to requests for fair hearings emanating from New York City residents; (b) evidence of the time from issuance of such directives to the implementation of aid continuing; (c) evidence supporting the assertion that the total City agency caseload is likely to remain constant; (d) evidence that

monthly case closings and openings, when accounting for re-openings, are likely to be equal; (e) evidence supporting the proposed selective review processes, including evidence specifying the number of review and authorization actions from which supervisors will be relieved under the processes, as compared to the current procedures; (f) evidence showing the number of supervisory actions and tasks assistant group supervisors will be expected to perform in addition to their regular caseloads; and (g) any evidence suggesting the probability of additional staff or further redeployment of staff in the event that the current redeployment, if allowed to move forward, fails to improve the provision of aid continuing. City Defendants should serve this report on the Court and Plaintiffs. Plaintiffs shall have an appropriate time to respond, as determined by the Court upon inspection of the nature and scope of Defendants' submission.

Because the Court has temporarily extended the current stay, Plaintiffs' alternative request for an order enjoining any reduction in the benefits of any recipient without first positively determining that the recipient has not made a timely request is denied.

### Conclusion

For the reasons stated, Plaintiffs' motion for class certification is granted. Plaintiffs' motion for preliminary injunction is provisionally granted as explained above. Parties are reminded that a conference is scheduled in this matter for January 11, 1995.

**SO ORDERED.**